# RALPH LOVEJOY v. MINNEAPOLIS-MOLINE POWER IMPLEMENT COMPANY.

79 N. W. (2d) 688.

December 7, 1956—No. 36,922.

 

*Robb, Robb & Van Eps,* for appellant.
*Mahoney & Mahoney,* for respondent.

KNUTSON, JUDGE.

Plaintiff was employed as a farm manager by R. S. Kincaid on a farm in Washington County, in this state. Among the machinery on the farm was a 1941 Minneapolis-Moline RT tractor purchased by Kincaid from J. L. Leighton Company, a dealer in farm implements located in Minneapolis. There were other tractors on the farm, and the one involved here was used mainly for belt or power work, such as silo filling, shelling corn, sawing wood, and running other equipment. For that purpose it was equipped with a rotating pulley. The tractor and pulley were designed and manufactured by defendant. The pulley was constructed of cast iron and consisted of the outer rim, six spokes, and the hub. In the manufacture of it, the pulley was cast in one piece and then split in two for machining and for convenient attaching to a shaft which was integrated by means of bevel gear on the pulley shaft which meshed with a pinion on the drive shaft of the tractor. The pulley, shaft, and gear could be removed as a unit from the tractor, but when it was attached it revolved whenever the tractor was driven in gear, whether by power from the motor or propelled in some other manner while in gear. Only by removing the pulley could the tractor be driven in gear without rotating the pulley. The two halves of the pulley could be removed from the shaft by removing four bolts holding the two halves together, but that would leave the shaft revolving, which was considered dangerous. Otherwise the entire pulley unit could be removed by unscrewing six cap screws which held the unit to the transmission housing. When the unit was removed, a plate was

placed over the opening where it had been in order to prevent the oil from the transmission from escaping.

The tractor was equipped with a handbrake. The speed of the tractor, when driven by the motor, was controlled by a variable speed governor of the "fly-ball" type, which regulates the amount of gasoline entering the engine and thereby controls its speed. Defendant furnished an instruction book with the tractor. Among other things, the book contains the following instruction with respect to the governor and the recommended speed of the tractor:

"The E. E. Engine is equipped with a variable speed governor 'J,' * * * of the fly-ball type, and has a governed range of the engine of from 400 R.P.M. idling speed with the control lever 'C,' * * * pulled to the extreme backward position, to 1400 R.P.M. load speed with the lever 'C,' * * * pushed forward as far as posssible.

* * * * *

"The complete governor can be removed from the engine by unscrewing the four cap screws with which it is attached to the case.

"The engine speed can be adjusted by means of a slotted screw in the side of the governor housing.

"The recommended engine speed is 1400 R.P.M., which produces a belt pulley speed of 933.

"If no speed indicator is available, you may set the gears in low, run the tractor over the ground and count the revolutions of one of the rear wheels. The wheel will turn 16 times per minute with an engine speed of slightly less than 1400."

The instruction book contains the following specifications relating to speed:

"SPECIFICATIONS OF THE ENGINE

* * * * *

"R. P. M. .....................................Maximum 1400

* * * * *

"SPECIFICATIONS OF THE TRACTOR

"Speeds ...........................Four Forward and Reverse

* * * * *

"Low ..................................... 2.3
Second ................................. 3.3
Third .................................. 4.2
High .................................. 12.0
Reverse ............................... 2.6"

On June 23, 1949, plaintiff was using this tractor for hauling a trailer loaded with hay. At the time of the accident, hereinafter described, he was traveling on a graveled road. He started down a hill having a grade of about 15 to 20 percent with the tractor in low gear, using the compression of the engine for braking power. Proceeding in that fashion, gravity furnished the force to carry the tractor forward. He attained a speed of from five to seven miles per hour. The speed of the pulley, with the engine turning at the recommended maximum speed of 1,400 r.p.m., was 933 r.p.m. At that speed, the tractor in low gear would be moving 2.3 miles per hour. The speed of the pulley increased as the speed of the tractor increased in low gear to the following extent: At 2.3 miles per hour the pulley revolved 933 r.p.m.; at 4.6 miles per hour the pulley revolved 1,866 r.p.m.; and at 6.9 miles per hour the pulley revolved 2,799 r.p.m.

As plaintiff proceeded downhill at a speed of five to seven miles per hour, it follows that the pulley was revolving at something in excess of 2,000 r.p.m. When plaintiff had gone downhill some distance, the pulley disintegrated into several pieces, one of which hit plaintiff on the foot and leg, inflicting the serious injuries for which he now seeks to recover. There is no dispute that a revolving wheel develops a centrifugal force which increases with the speed of the rotation as the square of the velocity to a point where the force exceeds the strength of the material of the object rotated, causing the object to disintegrate when the breaking point is reached. While defendant's instruction book contains specifications and recommendations as to the maximum speed, it contains no warning that it is dangerous to exceed such speed.

After a trial, the court directed the jury to return a verdict in favor of defendant. This appeal is from an order denying plaintiff's

motion for judgment notwithstanding the verdict on the merits and for a new trial on the issue of damages only or, in the alternative, for a new trial on all issues.

Plaintiff contends that defendant was negligent in designing and manufacturing the tractor and in failing to adequately warn the user of the danger of driving the tractor with the pulley attached at the speed at which it was driven.

On the merits of the case, defendant contends: (1) That a manufacturer of a chattel is not guilty of negligence or any actionable wrong for selling the chattel if it is not defective or dangerous to others at the time of sale; (2) that a manufacturer of a chattel is not liable to a person who is injured as the result of using the same in a manner different from the intended use thereof; (3) that a manufacturer of a chattel is not liable to the user thereof where the manufacturer makes known to the user the qualities of the chattel and the manner of safely using it; (4) that the evidence fails to show that the sale of the tractor to plaintiff's employer involved any "imminent danger" to the user thereof and consequently that defendant was not guilty of any breach of duty or negligence; and (5) that plaintiff's operation of a tractor down a hill with the governor cut out was an unusual, unexpected, and unanticipated act which defendant was under no duty to guard against.

It is to be observed that all of defendant's defenses are based on the assumption that (1) the tractor was not designed for use in the manner plaintiff used it; (2) such use was unusual and could not be anticipated by defendant; and (3) the instruction book furnished by defendant adequately described the manner in which the tractor could be used safely.

Essentially, defendant claims that this tractor was designed for operation at a speed of 2.3 miles per hour, with a maximum engine r.p.m. of 1,400, which would permit the pulley to revolve at a maximum of 933, and that defendant could not, or should not, be required to have anticipated that the tractor would be operated downhill at a speed in excess of 2.3 miles per hour in low gear. Defendant further contends that the instruction book contained

sufficient warning that it was dangerous to operate it at a speed in excess of that mentioned in the specifications.

■ At the outset, it is elementary that a motion for a directed verdict—

"* * * accepts the view of the *entire* evidence most favorable to the adverse party and admits the credibility (except in extreme cases) of the evidence in his favor and all reasonable inferences to be drawn therefrom," and such motion "should be granted only in those unequivocal cases where (1) *in the light of the evidence as a whole,* it would clearly be the duty of the trial court to set aside a contrary verdict as being manifestly against the *entire* evidence, or where (2) it would be contrary to the law applicable to the case."[1]

■ In this state it is well established that the manufacturer of a chattel may become liable to those who it should expect will use the chattel if it fails to exercise reasonable care in the design thereof, or in the use of material, which it should realize will involve an unreasonable risk of bodily harm to the one using such chattel for a purpose for which it was manufactured and sold even though there is no privity between the user and the manufacturer.[2] Such manufacturer also may be liable if he knows or should know that the chattel is apt to cause bodily harm if not used in a specific manner if he fails to furnish adequate warning as to the dangers inherent in its use. If the manufacturer undertakes by printed instructions to advise of the proper use to be made of a chattel, he assumes the responsibility of giving accurate and adequate instructions with respect to the dangers inherent in its use in some other manner.[3]

[1]Hanson v. Homeland Ins. Co. 232 Minn. 403, 404, 45 N. W. (2d) 637, 638; see, also, Van Tassel v. Patterson, 235 Minn. 152, 50 N. W. (2d) 113.

[2]Schubert v. J. R. Clark Co. 49 Minn. 331, 51 N. W. 1103, 15 L. R. A. 818; Heise v. J. R. Clark Co. 245 Minn. 179, 71 N. W. (2d) 818; Hartmon v. National Heater Co. 240 Minn. 264, 60 N. W. (2d) 804; see, also, Restatement, Torts, §§ 388 to 390, 394, 395; MacPherson v. Buick Motor Co. 217 N. Y. 382, 111 N. E. 1050, L. R. A. 1916F, 696; DiVello v. Gardner Machine Co. (Ohio) 102 N. E. (2d) 289; but see Wood v. General Elec. Co. 159 Ohio St. 273, 112 N. E. (2d) 8, on right of subpurchaser to recover for breach of implied warranty.

[3]Hartmon v. National Heater Co. 240 Minn. 264, 60 N. W. (2d) 804.

The law evolved from these authorities is that, where a manufacturer designs and manufactures a piece of equipment, negligence may be predicated upon a failure to so design it, or to use material of such quality and strength, that it will be safe for the use for which it is intended. In determining the use for which a farm tractor is intended, the jury could find, from the evidence in this case, that the manufacturer should have anticipated that the tractor might be driven on a road downhill, using the compression of the engine for braking power, at a speed that would rotate the pulley, as designed by defendant, faster than the material and design used in its manufacture could safely be done. Whether the speed involved here was such as should reasonably have been anticipated by defendant in designing and manufacturing the tractor are questions which should have been submitted to the jury.

It is also the law that, if no risk could reasonably be anticipated as a result of the use of the chattel, no negligence can be predicated upon such use.[4] To establish negligence, there must be a risk reasonably foreseeable. If the chattel is used for some purpose or in some manner which could not reasonably have been foreseen or anticipated by the manufacturer, he cannot be held liable for injuries resulting from such use.[5]

The parties are in substantial agreement as to the applicable law but differ widely as to the application of the law to the facts in this case. Defendant contends that the pulley was safely designed and manufactured for the use for which it was intended; that it was intended to operate at a maximum speed in low gear of 2.3 miles per hour; and that at that speed the engine would generate a maximum r.p.m. of 1,400 and the pulley 933. Plaintiff, on the other hand, contends that the manufacturer should have anticipated that the tractor would be operated downhill at times, using the compression of the engine for braking power, at a speed as great as that involved here and that at such speed the pulley would rotate at a speed which was

[4]Despatch Oven Co. v. Rauenhorst, 229 Minn. 436, 40 N. W. (2d) 73.
[5]Greenwald v. Northern States Power Co. 226 Minn. 216, 32 N. W. (2d) 320.

imminently dangerous to those in the vicinity of the tractor when the pulley reached a breaking point. The court was of the opinion that the evidence was such that a finding of negligence would be based purely on speculation; therefore, that plaintiff had failed to make out a case of negligence for the jury.

Plaintiff called as an expert witness Dr. Ralph L. Dowdell, who is head of metallurgical engineering at the University of Minnesota. That he was a witness well qualified can hardly be open to serious doubt. It was his opinion that the pulley disintegrated as the result of centrifugal force and that the design of the pulley and the material used were such that it was unsafe if rotated at a speed in excess of 955 r.p.m. There is evidence also that a handbook prepared by a testing laboratory sets the safe speed of a pulley designed and manufactured as the one involved here at 955 r.p.m. It is true that there is testimony to the contrary by other experts called by defendant, but, for the purpose of testing the motion for a directed verdict, we must accept the credibility of plaintiff's witnesses.

The question then arises: Should defendant have anticipated that the tractor would be operated at a speed greater than 2.3 miles per hour in low gear? It is conceded by defendant's witnesses that it is good practice to use the compression of the engine for braking power in going downhill. There is no warning in defendant's instruction book that it was dangerous to so operate the tractor at a speed in excess of the recommended speed. We are of the opinion under these circumstances that it was for the jury to determine from all the evidence: (1) What caused the pulley to break? (2) Should defendant have anticipated that the tractor would be operated at a speed in excess of the recommended speed? (3) If it should have so anticipated, did it give the user of the tractor adequate warning of the dangers inherent in such use? It is not unusual for experts to differ as to the cause of a given result. The credibility of the testimony and the weight to be attached to it are for the jury. There is sufficient foundation here for a finding of negligence if the jury accepts the testimony of plaintiff's witnesses. Under these circumstances, it was error to direct a verdict.

■ Plaintiff also bases his right to recover on a breach of an implied warranty of fitness for the use intended. While it is often difficult to distinguish between negligence and a breach of implied warranty of fitness in this kind of a case,[6] this case has been tried on the theory of negligence. While implied warranty is mentioned in plaintiff's complaint, there is no indication that the case was tried on that theory, nor has the question of whether a subpurchaser may recover of the manufacturer on the theory of a breach of an implied warranty of fitness been briefed here or covered in the oral argument. Apparently this theory of a right to recover is injected into the case by plaintiff in the hope that, if the case should go against him on the theory of negligence, the court might yet provide him a course of procedure under which he may prevail. Plaintiff briefly mentions the theory in his brief without any discussion of the applicable law. Defendant does not even mention the subject. In view of the inadequacy of the presentation, plus the fact that this theory of recovery seems to have been overlooked in the trial, we do not feel obliged to determine now whether a subpurchaser of a chattel may recover of the manufacturer of the chattel, without privity of contract, in a case of this kind.[7] On the contrary, we leave the question of whether such right of recovery should be extended to a case of this kind to such time as it is adequately presented to the trial court and here.

■ Plaintiff assigns as error several of the court's rulings on evidence. He offered to prove by his metallurgical expert that types of material other than that used, from which a pulley could be constructed, would have been safe under the conditions here involved. Defendant objected on the ground that such proof was immaterial, and the objection was sustained. We think that this evidence should have been admitted. In determining whether the material used for the manufacture of a chattel is reasonably suitable for the purpose

[6]See, Greco v. S. S. Kresge Co. 277 N. Y. 26, 12 N. E. (2d) 557, 115 A. L. R. 1020.

[7]See, Prosser, Torts (2 ed.) § 84, pp. 506 to 511; Torpey v. Red Owl Stores, Inc. (D. Minn.) 129 F. Supp. 404.

for which it was intended and those uses which may be reasonably anticipated, the availability of other material oftentimes is the best proof of suitability.[8] It becomes immaterial only if we assume that defendant could not reasonably anticipate that the tractor would be operated at a speed under which the material used was inadequate.

Plaintiff next contends that the court erred in admitting the opinion of defendant's expert witnesses. He relies on Saaf v. Duluth Police Pension Relief Assn. 240 Minn. 60, 64, 67, 59 N. W. (2d) 883, 886, 887, where we said:

"* * * Where expert testimony must be *solely* relied on to show the causal connection between the alleged cause and a certain subsequent result * * *, medical testimony which does nothing more than show a mere possibility, suspicion, or conjecture that such causal relation exists, without any foundation for the exclusion of other admittedly possible causes, provides no proper foundation for a finding of a causal connection. Affirmatively stated, in order to have a proper foundation for a finding of causal connection, in cases where such connection must be established *solely* by expert testimony, the medical expert must *upon an adequate factual foundation* testify not only that in his professional opinion the injury in question *might* have caused or contributed to the subsequent death of the injured person but further that such injury *did* cause or contribute to his death, but such medical testimony need not be couched in any particular words. * * *

* * * * *

"* * * Where two opposing inferences can be drawn with equal justification from the same circumstantial evidence so that one inference cannot reasonably be preferred over the other, neither is of evidentiary weight in support of a court's finding even though consistent with it and both must be rejected as purely speculative."

We have frequently held that the sufficiency of a foundation for the opinion of an expert is a matter resting largely in the discretion

---

[8]See, Prosser, Torts (2 ed.) § 30, pp. 122, 123; Heise v. J. R. Clark Co. 245 Minn. 179, 71 N. W. (2d) 818.

of the trial court.[9] Defendant's experts were of the opinion that the pulley broke as the result of some force applied either to the gear and pinion or to some other external force. The opinions were based on marks found on the pinion and other evidence of breaks and cracks found to have occurred, which they reasoned were caused by something other than centrifugal force. The markings found on parts of the broken pulley assembly form a sufficient factual basis for expert opinion.[10] The fact that plaintiff's witnesses attempted to negate the existence of facts which the experts found did exist does not destroy the factual basis furnished for the opinion of these experts. That is especially true where there is a conflict in the testimony with respect to the evidence as to whether such factual basis did exist. Nor does the mere fact that on cross-examination the experts were unable to state unequivocally that the cause they advanced was the cause of the break sufficiently destroy the factual basis upon which they formed their opinions so that such opinions were inadmissible. The opinion of an expert does not become completely valueless simply because he will not exclude all other possible causes. At best, an opinion is a statement of belief as to how a result was caused. Here, the experts had such opinion. It was based on facts which they found to have existed. We think that it has a sufficient factual basis to furnish a foundation for the opinion. The weight to be given the opinion was for the jury.

Plaintiff next complains of the court's failure to permit his expert witness to explain the reasons for a change in his opinion. Before the case was commenced, Dr. Ralph L. Dowdell examined the parts of the broken pulley assembly and wrote a letter in which he said:

"According to my examination of the failed parts submitted, it appears that one of the six bolts, holding the complete belt pulley assembly to the transmission gear case, failed by fatigue over a period of time. These six bolts (size 1/2 in.) holding the pulley

[9]Woyak v. Konieske, 237 Minn. 213, 54 N. W. (2d) 649, 33 A. L. R. (2d) 1241; Smith v. Twin City Motor Bus Co. 228 Minn. 14, 36 N. W. (2d) 22.
[10]Lestico v. Kuehner, 204 Minn. 125, 283 N. W. 122.

assembly are about 3 in. apart and are spaced in a hexagonal pattern around the cast iron flange of the assembly housing. This flange is 1/2 in. thick and is flanged over a width of about 1 1/4 in.

"The fact that the one bolt failed by progressive cracking means that the pulley might not have been too well balanced so that operating stresses caused the bolt to fatigue through. This bolt was reported to have been at the '8:00 o'clock' position of the flange so there would be some play of the whole assembly after the bolt failed. With a pulley whirling around at perhaps 2000 rpm in a wobbly housing, almost anything could happen to the cast iron parts of the split pulley or the housing.

\* \* \* \* \*

"Microscopic analysis of the cast iron from the flange shows it to be normal in every way. Even the cast iron of the pulley is normal except for a small blow-hole of little significance. This method of construction is probably prevalent in the farm tractor field, so it would appear that we could not prove negligence on the part of design. All of the material entering into the construction is apparently good.

"It seems that the pulley assembly failed because of slight eccentricity of the pulley which then broke one bolt and allowed still more wobble until most of the assembly failed.

"On taking apart the assembly, it was found that the inner ball race next to the pulley had an old crack, and a piece about an inch in length was actually broken out. This broken out innner race might have taken place before the bolt failure and might even have contributed to it by allowing more wobble on the pulley end. \* \* \*

"The machining of the pulley housing assembly was definitely at fault because there was no radius on the inside of the flange which was bolted to the engine crankcase of the tractor. This 90° angle, without a fillet, is certainly not good engineering practice because it materially lowers the toughness of the assembly. It should be noted here that nearly all of the main assembly broke off almost clean at this location.

"If negligence were involved, one would think it would be on the part of the operator of the tractor. The operator, sitting close to the pulley, should have been able to detect audible sounds from any eccentricity or misalignment and should have promptly made adjustments or simply have refused to drive it. On the other hand, the split pulley design was not good basically, because after a period of time the balance could be thrown off more easily by warpage of the different halves of the cast iron."

At the time of the trial he stated that it was his opinion that the pulley broke from centrifugal force. The court refused to permit him to explain that the reason for the change in his opinion was that at the time he wrote the letter above referred to he did not have the facts upon which he now bases his opinion. We believe that it was error to exclude this evidence. Where an opinion is based upon a given set of facts and it develops later that those facts are not complete, we see no reason why the expert should not be permitted to explain the reason for his change of opinion.

■ Finally, plaintiff seeks to invoke the rule of res ipsa loquitur. The rule has no application in this case. Plaintiff's witnesses and those of defendant differ as to the cause of breakup of the pulley. In Boutang v. Twin City Motor Bus Co. 248 Minn. 240, 244, 80 N. W. (2d) 30, 36, we recently said:

"* * * the res ipsa loquitur rule has application only where the apparent cause of the accident is such that the defendant would be solely responsible for any negligence connected with it; and if an unexplained accident may reasonably be attributed to one or more causes for which the defendant is not responsible, it is error to apply the rule as a basis for a permissive inference of negligence."

Here, the jury could find that the pulley broke as the result of one of several causes. Under these circumstances, the rule has no application.

For the reasons stated above, there must be a new trial on all issues.

Reversed.