**FARMERS UNION FEDERATED COOP-ERATIVE SHIPPING ASSOCIATION, a corporation, Appellant,**

v.

**Charles McCHESNEY, Appellee.**

**No. 15811.**

United States Court of Appeals Eighth Circuit.

Jan. 10, 1958.

442

Roy A. Ilvedson, Minot, N. D. (Ilvedson, Pringle, Herigstad & Meschke, Minot, N. D., and Leonard Langen, Glasgow, Mont., on the brief), for appellant.

M. J. Doepker, Butte, Mont. and C. A. Waldron, Minot, N. D. (Doepker & Hennessey, Butte, Mont., and Waldron & Kenner, Minot, N. D., on the brief), for appellee.

Before SANBORN, JOHNSEN, and VOGEL, Circuit Judges.

VOGEL, Circuit Judge.

Charles McChesney, a citizen of Montana, plaintiff-appellee, brought this ac-

tion against the Farmers Union Federated Cooperative Shipping Association, a North Dakota corporation, asking for damages arising out of a collision between an automobile driven by McChesney and a tractor-trailer truck operated in behalf of the defendant-appellant. The case was tried to a jury and resulted in a verdict in plaintiff's favor in the amount of $32,211. Upon denial of a motion for a new trial, the case was appealed to this court.

On March 25, 1955, plaintiff was driving in an easterly direction on U. S. Highway No. 2 about seven miles east of the City of Ray, North Dakota. He encountered blizzard conditions and reduced his speed to about ten miles per hour. He came to a cut in the highway and quite suddenly found that he could see nothing because of blowing snow. He stopped and opened the door to ascertain where the center yellow line of the highway was located and to get his bearings. As he did so, he heard the noise of a Diesel truck from the rear. He closed his door, began honking his horn and proceeded on east at about two to five miles per hour. After he had been honking his horn for approximately 20 seconds or longer, he was struck in the rear by the defendant's truck.

Plaintiff claimed that he suffered a permanent whiplash injury to his neck and cervical spine and that his ability to follow his occupation as a rancher and stock raiser was greatly impaired.

Defendant's first contention of error on appeal is that:

"The Trial Court Committed Prejudicial Error in Admitting into the Evidence the Testimony of John Billstein, Witness for the Plaintiff, and Exhibit 11, Pertaining to the Cost of an Annuity Contract and the Annuity Mortality Life Expectancy."

John Billstein, district manager for a life insurance company in the business of selling life insurance and annuities, testified in behalf of the plaintiff, over objection, concerning the premium that would have to be paid to his insurance company to purchase an annuity for the plaintiff. He testified that his company would consider paying the plaintiff $10.00 a month for the rest of his life, considering his birth date, for a single premium of $1,691; a $100-a-month annuity for the rest of plaintiff's life would require a single immediate premium of $16,910; an annuity of $500 a month would require a single premium annuity payment of $84,550. The witness stated that these calculations were based upon "The Annuity Table For 1949, based on the averages through the years 1939 and 1949". Such annuity table fixed the life expectancy of the plaintiff at 14.83 years. A standard mortality table gave a life expectancy for the plaintiff of 11.55 years. The witness used the so-called annuity table because "It's a known fact that a man who receives an income after age 65 without financial worry has a greater life expectancy". Plaintiff's Exhibit 11 was a computation showing the cost of a life annuity policy with Billstein's company for Charles McChesney, date of birth August 4, 1891, age 65¼, with a life expectancy "based on Annuity Mortality Table for 1949 . . . 14.83 Years" and which set forth the single premium costs as heretofore indicated.

The correct rule for the recovery of damages for loss of or diminished earning power is the gross amount of such lost earnings reduced to their present cash value. See Geier v. Tjaden, N.D., 1955, 74 N.W.2d 361, 365; Jones v. Eppler, Okl.1953, 266 P.2d 451, 457. To assist the jury in determining the gross amount of lost earnings where such decreased or lost earning capacity is considered permanent, standard mortality tables are admissible. Pauly v. McCarthy, Utah, 1947, 184 P.2d 123, 129; Geier v. Tjaden, supra, 74 N.W.2d at page 368, and Section 31–0805, North Dakota Revised Code, 1943:

"*Statistical Tables Admissible to Establish Life Expectancy.* In all cases in which the probable duration of the natural life of any person from and after a particular age

is material, standard statistical tables of mortality are competent evidence of such probable duration or expectation of life."

To assist the jury in determining the present cash value of lost future earnings, the testimony of an actuary with reference to the present cash value or the introduction of present worth tables is entirely proper.

■■ The cost of an annuity for the remainder of the injured person's life is not the measure of recovery for lost or diminished earning power. The measure is, as we have stated, the gross amount of the lost earnings reduced to their present cash value. Plaintiff's method of proof here sought to hold defendant to the cost of this particular insurance company's annuity, which of course included a profit to the company, whose interest or discount rate was undisclosed and which was based upon a special annuity life expectancy table indicating an increased life expectancy existing solely because of the annuity itself. An additional reason for inadmissibility of the cost of an annuity is the fact that it does not take into consideration that earning capacity, at least to its fullest extent, does not endure to the end of life expectancy but diminishes with age. We conclude that the trial court erred in admitting the evidence as to the cost of an annuity. Whether this error alone would, in view of the fact that the court correctly instructed the jury as to the proper measure of damages for loss of earning capacity, require the reversal of the judgment appealed from, we find it unnecessary to decide.

Defendant's second point is:

"The Trial Court Committed Reversible and Prejudicial Error on Cross Examination of Dr. Paul L. Johnson in Permitting Counsel for Plaintiff to Quote and Read Extensively from an Article on Back Problems from the School of Medicine at Western Reserve University of Cleveland, Ohio."

Dr. Johnson, defendant's expert witness, was being cross examined. He was asked the following question:

"Q. I have here the volume that was a discussion of various back problems at the school of medicine at the Western Reserve University of Medicine in Cleveland. You have attended that, have you not, on numerous occasions in your study? Didn't you spend a part of your time of your training there?"

To which question he answered:

"A. I did not. I have been at Western Reserve University in Cleveland, but I never attended any courses there."

Objections were made to the reading and cross examining of the witness from the volume which was apparently a transcript of a discussion held at the School of Medicine at Western Reserve University. The objections were that it was incompetent, no proper foundation, improper cross examination, no showing that the "volume" was an accepted medical book or accepted in the field of medicine, no showing that the witness had read it or that he had relied upon it for his diagnosis. The objections were overruled and counsel for the plaintiff was permitted to read extensive paragraphs from the "volume", whose author or authors remained unidentified and who, of course, were not there subject to cross examination.

■ Ordinarily the scope of cross examination must necessarily be left largely to the discretion of the trial court. Where that discretion has been abused, however, this court has the duty of taking cognizance thereof and we think this such a case. One example of the type of question based upon the unknown volume will suffice:

"Q. Now I have a summary that I would like to ask you about. Briefly that summarizes the pathology of the common arthritic conditions of the spine. 'Now what is the specific effect of injuries on these involved

spines? The effect in the arthritic spine is *exactly* the effect that we see in the non-arthritic spine. We see the same fractures, the same disherniations, the same muscle tears, the same ligamentous injuries that have already been covered in this symposium. What is the difference? The difference is that the arthritic spine is the unprotected spine. The normal resilience of the structures about the vertebral column, the normal resilience of the muscles and of the ligaments has been completely lost. The difficulties can have degenerated and the normal cushioning effect of the disc is completely lost so that relatively minimal trauma in an arthritic sprain may produce gross damage, and the patient who says, "I sat down hard in a chair and felt something give in my back" should be X-rayed because even trauma that slight may produce severe compression fractures. The patient who leans over in an awkward position and picks up a 10-pound weight may produce the same severe degree of muscular damage that the younger patient who lifted 150 pounds may produce. The reason for this, of course, is that there has occurred gross atrophy of the muscles, and we have noted these muscles are much more easily damaged than normal muscles and are slower to repair, so that in addition to being much more susceptible to injury the effects of the injury may last inmeasureably longer in these people.' Isn't that a fair statement of the situation, Doctor?

"A. I don't believe that it applies to this case because he specifically states that these muscles are atrophied. There was no evidence of atrophy of any muscles in this individual, and it appears to be indicated that he has been a very healthy and active individual."

 There was no attempt to introduce the unknown "volume" itself, and of course, the great weight of authority would prohibit the introduction of medical books or treatises even if it were established that such were recognized standard authorities on the subject, the reason, among others, being that the authors are not present and subject to cross examination. See Briggs v. Chicago, Great Western Ry., 1953, 243 Minn. 472, 57 N.W.2d 572, 582; 20 Am.Jur., Evidence, § 968, pp. 816, 817. The effect here was to do indirectly that which plaintiff's counsel could not do directly; in other words, there was gotten before the jury the substance of an unrecognized medical symposium whose participants were unknown and which had not been relied on or read by the witness. We think the allowance was improper. There are situations where medical books may be properly used in cross examination of a medical witness. A medical witness may be cross examined on a book which he admittedly has used in giving his direct examination and there need be no foundation laid for the use of the book other than that the witness has relied thereon. A medical witness who admittedly has based his testimony on standard recognized authorities may, for impeachment purposes, be cross examined on such authorities generally. This requires a foundation establishing that the references used in cross examination were generally recognized as being standard authorities by the medical profession. Bowles v. Bourdon, 1949, 148 Tex. 1, 219 S.W.2d 779, 13 A.L.R.2d 1, 6; Briggs v. Chicago, Great Western Ry., 1953, 243 Minn. 472, 57 N.W.2d 572. Neither of these situations exists in the instant case. The witness here had not used the volume from which he was being cross examined; and, further, he was not familiar with it. No foundation was laid establishing the volume as a standard recognized authority.

Plaintiff cites the case of State v. Brunette, 1914, 28 N.D. 539, 150 N.W. 271, as support for his contention that the cross examination of the witness here was proper. No claim was made there that the book being used was not a standard accepted medical authority. That

case is support for the proposition that where a medical witness has, in direct examination, based his opinions upon medical authorities generally, it is permissible in cross examination to read to him portions of medical authorities and ask if he concurs therewith or differs therefrom; but that when this is done, the proper practice is for the court to caution the jury that it is the testimony of the witness and not what is read from the book that constitutes evidence in the case. We find no case which goes so far as to say that a medical witness may be cross examined from a completely unknown, unauthenticated volume describing itself as a "symposium" and which was neither read nor relied upon by the witness. The effect here is to give to the statements, put in the form of questions, an authenticity as having come from an established medical text sponsored by Western Reserve University. No such authenticity was established. The speakers at this "symposium" are anonymous and insofar as the record indicates may have been medical students or persons not even learned in the medical profession. We think the objection to this type of cross examination should have been sustained and that failure to do so was error.

 The next claim of error is:

"The Trial Court Committed Reversible and Prejudicial Error in the Admission of the Testimony of the Plaintiff and the Plaintiff's Witness, Frank LaPlant, Regarding the Offer Made by a Prospective Purchaser of the Ranch Providing That McChesney Would Manage Said Ranch at a Salary of $10,000.00 a Year."

Over objections, plaintiff was allowed to testify that in 1951 he had received an offer from a prospective purchaser of his ranch to stay on and manage the ranch for a salary of $10,000 a year. Witness LaPlant testified that he overheard the specific offer. The prospective purchaser who allegedly made the offer to employ the plaintiff and pay him $10,000 a year in 1951 was not present subject to cross examination. We think the admission of the testimony with reference to the offer to hire was improper.

Offers to hire in order to establish the value of services are in the same classification as offers to buy property in order to establish the market value thereof. The Supreme Court of the United States, in the early and much-quoted case of Sharp v. United States, 1903, 191 U.S. 341, 349, 24 S.Ct. 114, 115, 48 L.Ed. 211, had this to say:

"To be of the slightest value as evidence in any court, an offer must, of course, be an honest offer, made by an individual capable of forming a fair and intelligent judgment, really desirous of purchasing, entirely able to do so, and to give the amount of money mentioned in the offer, for otherwise the offer would be but a vain thing. Whether the owner himself, while declining the offer, really believed in the good faith of the party making it and in his ability and desire to pay the amount offered, if such offer should be accepted, or whether the offer was regarded as a mere idle remark, not intended for acceptance, would also be material upon the question of the *bona fides* of the refusal. Oral and not binding offers are so easily made and refused in a mere passing conversation, and under circumstances involving no responsibility on either side, as to cast no light upon the question of value. It is frequently very difficult to show precisely the situation under which these offers were made. In our judgment they do not tend to show value, and they are unsatisfactory, easy of fabrication and even dangerous in their character as evidence upon this subject. Especially is this the case when the offers are proved only by the party to whom they are alleged to have been made, and not by the party making them. There is no chance to cross-examine as to the circumstances of the party making the offer in regard to good faith, etc. Evidence of this character is entire-

ly different from evidence as to the price offered and accepted or rejected for articles which have a known and ready sale in the market. The price at the stock exchange of shares of stock in corporations which are there offered for sale or dealt in is some evidence of the value of such shares."

See also Missouri Public Service Co. v. Hunt, Mo.App., 1954, 274 S.W.2d 27, 31; Cullers v. Commissioner of Internal Revenue, 8 Cir., 1956, 237 F.2d 611, 615; Merchants Motor Freight, Inc. v. Downing, 8 Cir., 1955, 227 F.2d 247, 250. The offer here was made in 1951. The offeror was not present in court for cross examination. The offer was related to an offer to purchase the plaintiff's ranch. Obviously, the defendant would desire and certainly should have had the right to cross examine the person making the offer. It was error to overrule the objection and receive the testimony of the offer.

Defendant also contends:

"The Plaintiff Was Himself Guilty of Contributory Negligence As a Matter of Law Which Proximately Contributed to the Collision."

Contributory negligence is generally a matter for a jury's determination. It is only where the minds of reasonable men could not differ on the existence thereof that the court is justified in finding contributory negligence as a matter of law. The facts here indicated in the record justify no such conclusion. The case was clearly one for a jury's determination.

Defendant's next point is:

"The Verdict of $32,211.00 Is Highly Excessive under the Evidence."

In view of the fact that this case must be retried, no good purpose would be served in discussion of this point.

Defendant lastly contends:

"That the Court Committed Reversible and Prejudicial Error in Refusing to Grant Defendant's Re-

quested Instructions 9 and 10 to Charge the Jury That If the Collision Involved in This Case Was an Unavoidable Accident, the Plaintiff Cannot Recover."

The subject matter of Requested Instructions Nos. 9 and 10 was sufficiently covered in the court's own language. The court was not required to use the language contained in a specific request. We have examined the court's charge in its entirety and find it complete and accurate. However, because of the errors already pointed out, this case is reversed and remanded for new trial.