**LAND O'LAKES CREAMERIES, INC.,**
a Corporation, Appellant,

v.

**La Vern HUNGERHOLT, Appellee.**

No. 17209.

United States Court of Appeals
Eighth Circuit.

June 27, 1963.

Charles A. Bassford, Minneapolis, Minn., Nathan A. Cobb and Charles A. Bassford, of Richards, Montgomery, Cobb & Bassford, Minneapolis, Minn., on the brief, for appellant.

Walter E. Riordan, Minneapolis, Minn., William E. Kalar and Robert M. Austin, Minneapolis, Minn., on the brief, for appellee.

Before VOGEL, VAN OOSTERHOUT and RIDGE, Circuit Judges.

VOGEL, Circuit Judge.

This action was commenced by La Vern Hungerholt, plaintiff-appellee, against Land O'Lakes Creameries, Inc., defendant-appellant, to recover money damages for injuries allegedly caused by appellant's negligence in manufacturing and bagging commercial fertilizer. The jury returned a verdict in favor of the plaintiff in the sum of $90,400. Land O'Lakes thereafter moved for judgment notwithstanding the verdict or in the alternative for a new trial. From judgment in favor of Hungerholt which followed the denial of both motions, appeal was taken to this court.[1] Diversity of citizenship and amount involved satisfy federal jurisdictional requirements.

Appellant is a Minnesota corporation and is engaged in the manufacture, distribution and sale of commercial fertilizer, feeds, dairy products and poultry, together with bags and containers therefor which it places on the market to be purchased and used by the general public. Among other products manufactured,

---

1. The trial court's opinion denying the motions will be found at 209 F.Supp. 177.

distributed and sold by the appellant is a fertilizer known as 5-20-20, an inorganic chemical compound derived from a manufacturing process described as the TVA ammoniating process which was developed in 1952 or 1953 by the Tennessee Valley Authority. Appellant acquired the right to use the system of manufacture in November or December 1955.

It was and is the appellee's contention that the appellant knew or should have known that its 5-20-20 fertilizer contained a number of ingredients that were caustic and corrosive and extremely harsh to human tissue and that some of the ingredients were primary irritants which would cause dermatitis on a normal skin; that the appellant negligently and carelessly packaged and handled its fertilizer so as to deliver bags thereof to the appellee which were torn and defective and which allowed the contents to spill out on the appellee; that the appellant negligently failed to warn appellee by means of a label on its bag or to warn by other reasonable means of the danger and harm to which the appellee was exposed while lifting, loading and transporting the appellant's fertilizer; and that while handling the fertilizer and without knowledge as to its dangers, he sustained injuries and damages which have totally and permanently incapacitated him and have caused him great pain, suffering and expense.

Land O'Lakes claimed it had no duty to warn and premised its defense on its evidence that its fertilizer product is not dangerous or injurious to human health or life; that it is not a new or experimental product; that the industry has been established for many years; that standard raw materials and processes are used without variation or deviation from those used in the industry and that experience itself has provided more than adequate "testing" or "research". The defense further contended that even if some negligence could be attributed to Land O'Lakes, the appellee should be barred from recovery by reason of his own contributory negligence.

The appeal here from the judgment entered in the District Court is predicated upon alleged error in denying appellant's motion for judgment notwithstanding the verdict and denying appellant's motion for a new trial and, additionally, on alleged misconduct of appellee's counsel.

■ A fairly comprehensive recitation of the facts as disclosed by the record seems to be required. In considering such facts, we do so in light of the rule expressed in Ford Motor Co. v. Zahn, 8 Cir., 1959, 265 F.2d 729, 730:

> "Since defendant's contention is that, under all the facts and circumstances of record, no submissible case was made, it is well to bear in mind the general rules governing any plea to displace a jury verdict: (1) All disputed fact questions and permissible inferences must be viewed in the light most favorable to plaintiff; (2) The question of negligence is usually for jury determination and it is only in rare situations, where there is no occasion for reasonable men to differ, that the question becomes one of law for the court; and (3) It is only where all or substantially all of the evidence is on one side, that a directed verdict should be entered. See Coca Cola Bottling Co. of Black Hills v. Hubbard, 8 Cir., 203 F.2d 859, 860, 861, and cases cited."

The record establishes the following: LaVern Hungerholt was employed by his brother in 1958 as a truck driver. He had been so employed for some ten or eleven months prior to the incident which gave rise to this cause of action. Hungerholt's duties included picking up fertilizer at appellant's plant in St. Paul and delivering it to various points in southern Minnesota. Most of the fertilizer carried by Hungerholt was of the type known as 5-20-20. At the Land O'Lakes plant he would load his truck by placing bags of fertilizer upon a conveyor belt running into his vehicle, picking the bags off the conveyor and piling them inside his truck. He had nothing

to do with the raw materials that went into the fertilizer but handled only the finished product. During the course of the loading process, Hungerholt found that occasionally he would come upon a bag that had a puncture hole in it or was torn so that the contents of the bag would spill out on him when he handled it. If the tear were apparent, Hungerholt could set the bag aside, but when the defect was on the underside he would not be aware of it until he picked up the bag.

On September 8, 1958, Hungerholt was engaged in loading 5-20-20 fertilizer. One of the bags had been torn open on the underside and as he handled it, it spilled and a considerable amount of the fertilizer poured into one of his boots. On that particularly warm day Hungerholt was wearing a different type of shoe apparel. While in the past he had always worn oxfords, he had this time changed to an engineer's boot which fit more loosely and had an opening at the top. This was also the first time that the entire contents of a bag had spilled on him.

Hungerholt completed his loading duties, which took about an hour and a half. During that time he noticed a "burning" around his right ankle but did not stop loading. When he had completed his work, signed his orders, etc., he then emptied the fertilizer from his boot. Upon arriving at his home that evening, he, on taking a bath, discovered a red spot on his right ankle about the size of a 50-cent piece. The next day the redness started spreading up his leg. Hungerholt kept working for about five weeks, during which time the inflamed area spread over his entire body. After consultation with a clinic at Rochester, Minnesota, on October 11, 1958, Hungerholt was given a prescription and sent home for therapeutic baths. This treatment was continued for about four to five weeks. His condition improved. He then returned to work, again hauling fertilizer as part of his duties. During the period that he resumed his occupation as a truck driver he did not seek any further medical attention. His condition became worse, however, and in March of 1959 he consulted Dr. Sevenants, a specialist in dermatology, at LaCrosse, Wisconsin. At that time he had developed large blisters on his hands and feet. Dr. Sevenants hospitalized Hungerholt and treated him for a period of about three weeks. When he was discharged he was told not to return to work as a truck driver. As a result, he had no further contact with the 5-20-20 fertilizer. The condition subsequently flared up repeatedly and he was re-hospitalized on a number of occasions. In his present condition any pressure, excitement, work or heat will cause him to break out and even the simple effort of picking up one of his children will cause a reflaring of the inflammation. As no challenge is made here with reference to the seriousness of Hungerholt's condition, we omit further details.

Hungerholt testified, and his attending physician's examination and investigation bore him out, that neither he nor members of his family had any history of allergic reactions. Without objection, Hungerholt testified that others who handled the fertilizer had suffered skin irritation and "breaking out".

Philip F. Stocker, who supervised the production of fertilizer at the appellant's plant, was called by the appellee for cross-examination and testified to the process used in the manufacture of 5-20-20 fertilizer. Either anhydrous ammonia or Solution 490 was included in the process. Solution 490 consists of 34% ammonia, 60% ammonium nitrate and 6% water. Sulfuric acid, phosphates and potash were added to one of these materials. The end product, however, did not include any free acid or ammonia.[2] According to Stocker, the 5-20-20 fertilizer could be made many different ways but the raw materials and the end product would be

2. Other testimony in the record was to the effect that in the manufacturing process these materials react with each other to produce a granulated and neutral finished product.

basically the same. Stocker testified that none of the materials in the finished product could be considered as primary irritants; that several of them were comparable to ordinary table salt; that he had personally handled them with no adverse effects; and, finally, that there had been no experience in the plant of employees being harmed by the ingredients of the fertilizer. He did admit that new employees got nosebleeds from working with the raw materials but that after a day or two the nosebleeds disappeared. He testified that some employees sustained inflamed areas or areas of irritation around the collar, but attributed this to perspiration. Stocker also testified that up until 1958 the appellant did not conduct any formal test to determine possible harmful effects the fertilizer might have on human tissue. He also stated that vast numbers of tons of fertilizer were sold each month and that he had never before heard of anyone alleging that he had been injured by the product.

Stocker explained that the fertilizer bags were placed on pallets for their transportation to storage bins awaiting loading operations. He said that the bags could easily become torn on nails protruding from the boards of these pallets, and also from being punctured or ruptured by a fork lift operator. The pallets were inspected and repaired twice a year. The total tearage of fertilizer bags amounted to 1%.

During the course of the cross-examination of Stocker there was received in evidence a booklet in which the State of Minnesota recommended the placing of notices on bags of fertilizer carrying the warning "injurious to livestock". Stocker also admitted that a number of times the 5-20-20 fertilizer was declared illegal by the State of Minnesota for failure to meet the standard of guaranteed analysis.

An analysis by W. C. McCrone and Associates of a bag of 5-20-20 manufactured in March 1962 by the appellant with anhydrous ammonia was introduced in evidence and showed the following ingredients to be present:

| Compound | Percent |
| --- | --- |
| Apatite | 1.6 |
| Dicalcium phosphate dihydrate | 8.6 |
| Monocalcium phosphate monohydrate | 5.5 |
| Monopotassium phosphate | 2.5 |
| Monoammonium phosphate | 19.1 |
| Calcium sulfate | 7.4 |
| Calcium sulfate hemihydrate | 6.8 |
| Potassium sulfate | 4.5 |
| Ammonium sulfate | 4.8 |
| Potassium chloride | 25.5 |
| Ammonium chloride | 6.2 |
| Calcium carbonate | 1.5 |
| Calcium silicate | 3.0 |
| Quartz sand | 2.0 |
| Moisture | 1.7 |
| Free acid | none |

If Solution 490 had been used instead of anhydrous ammonia the additional two compounds of potassium nitrate and ammonium nitrate would have also been present. There was no way of knowing which material was used in the manufacture of the fertilizer spilled into the appellee's boot.

Jose B. Calva, a consulting and research engineer registered in chemical, mechanical and electrical engineering, testified in behalf of the appellee. He had examined the manufacture of the fertilizer and had analyzed the contents of five of the bags. He testified that some of the ingredients found in the analysis are harmful to tissues. He stated that ammonium chloride is a corrosive substance because it is a combination of hydrochloric or muriatic acid and ammonia or ammonium hydroxide. The latter is an extremely weak base, while the former is a strong acid and Calva stated that the disparity in strength causes the corrosive effect. In addition to ammonium chloride, Calva specifically named ammonium sulfate, monoammonium phosphate and monopotassium phosphate as being harmful to the human skin. While these substances did not occur in

the bags he analyzed (they are listed in the analysis, Exhibit 15, introduced at the trial), this was not important since the contents of the bag in coming into contact with the skin absorb moisture and generate heat. This gives rise to a chemical reaction known as metathesis (exchanging of values) between the various ingredients and creates the substances named. According to Calva all ammonium salts, including ammonium nitrate, have a harmful peptizing effect on the tissues by breaking them down and dissolving them. He stated that ammonium chloride in particular is extremely harsh because the skin, upon contact with it, becomes highly absorbent of moisture and tends to burst. He explained that the length of time that the skin was exposed to the materials in the fertilizer and the presence of any abrasion inside the boot would also affect the reaction upon the skin.

Calva additionally testified that the appellant could have reduced the hazard from torn bags by placing screws in the boards of the pallets rather than nails.

Dr. Sevenants, Hungerholt's attending physician, also testified in his behalf. He first diagnosed the appellee's condition as an acute dermatitis, later denominating it as atopic eczema or dermatitis. He stated:

"Q. Yes. Could you tell us what your diagnosis was originally and what it is at this time?

"A. On the first four admissions the hospital diagnosis on discharge was acute dermatitis legs and ankles, thighs, entire upper extremities from contact with feed and fertilizer. That diagnosis was the same on the first four admissions. On the fifth admission and when he was discharged the diagnosis of atopic eczema was made."

Dr. Sevenants stated that Hungerholt had periodic improvement but that on February 20, 1962, his skin began to flare up again and has continued to do so until the present time. During the course of the treatment, Dr. Sevenants investigated as to whether or not any allergies were present in the family history of the patient and determined that there were none. He stated that based upon the history as given to him by Hungerholt, upon his knowledge of the contents of fertilizers, upon his training and upon the examination of this patient that the cause of his ailment was the spilling of the fertilizer inside the boot on September 8, 1958. He stated that some of the substances in the fertilizer are primary irritants that result in an ulcer and dermatitis through the action upon the skin and that Hungerholt later became sensitized or developed an allergic response to these chemicals or to the products which were formed in the tissues. He defined a primary irritant as something that will produce an adverse reaction or irritation upon the skin of any normal person; that is, it is not an allergic reaction. Friction and a small abrasion help in causing a reaction from a primary irritant and the primary irritant acts in a physical way as an acid would in burning the skin. In so burning the skin it destroys the upper layer of cells so that it then has entrance into the lower portions of the skin. Once this reaction has taken place, and the eruption spreads, the skin becomes sensitized and is no longer normal skin and may develop many and different sensitivities. The witness explained that once the skin has become sensitized, the toxic substances are absorbed in the blood vessels and thereby transmitted to other parts of the body, sensitizing skin over a wide area.

Dr. Sevenants stated that he had encountered other conditions of dermatitis that he had related to the use of fertilizer. In his practice he sees many farmers who have incidents of dermatitis about their wrists and ankles caused by handling fertilizer. He did not know of any case caused by this particular fertilizer. He stated that contact dermatitis or atopic eczema may be caused or aggravated by emotional disturbance but that in Hungerholt's case this did not appear to him to be the cause. The fact

that Hungerholt had experienced no difficulty with the fertilizer in the previous ten or eleven months he had been handling the substance was considered by the doctor in determining the cause of the irritation, but since the conditions of friction and perspiration were not formerly present in the same degree he felt that this did not indicate a different causative agent.

Dr. Isadore Fisher, who examined Hungerholt at the appellant's request prior to trial, testified in the appellant's behalf. He agreed that a primary irritant is one that will react on persons who have normal skin but said that if the fertilizer had contained such primary irritant the appellee would have had a reaction earlier than he did and it should not have been confined to the ankle in the first manifestation. In his opinion, the product could not possibly contain a primary irritant; hence, he concluded that the appellee must be suffering from an allergic reaction to fertilizer. Such a reaction could manifest itself at any time. He felt that the conditions present in the situation on September 8, 1958, were not basically different from exposure on the wrist or face or around the belt line or in the shoulder strap area. He testified that while contact dermatitis due to sensitization and allergy is known to occur in the fertilizer industry and in many other industries, he did not know of any case referring to primary irritation from fertilizers *per se*.

Fisher disagreed with Calva as to the primary irritant properties of the various chemical ingredients of 5-20-20 fertilizer. He stated that such chemicals at the concentrations found in the fertilizer could not be considered as primary irritants. Ordinary table salt could cause a burning sensation if applied to a previously damaged area. In testifying as to whether or not a substance is considered a primary irritant, Dr. Fisher admitted:

> "There might be individual ones that one person might agree about and another would disagree."

When Hungerholt was examined by Dr. Fisher, he refused upon advice to submit to a patch test because of the danger of further injury to him in his acute condition.

Dr. Ramon M. Fusaro was called as a witness for the appellant. He described making "patch tests" in which the suspect material was applied directly to the skin and held there by use of a protective gauze. 5-20-20 fertilizer made from both anhydrous ammonia and Solution 490 applied to the skin of the subjects was negative at 16 and 48 hours.

Dr. Sevenants and Mr. Calva explained that they did not make such tests on the appellee since their training and experience taught them that certain ingredients in the fertilizer were primary irritants without the necessity of such tests. Dr. Sevenants additionally stated that in Hungerholt's condition such a test would be contraindicated because of the strong possibility of aggravating the irritation. He testified:

> "Q. Now, Doctor, did you at any time from the time you first saw Mr. Hungerholt until now run any patch tests?
>
> "A. No, sir, I didn't.
>
> "Q. Could you tell the jury why?
>
> "A. I think there were two reasons, two good reasons why: One was the history as he gave it to me and the appearance of the lesions, that is, the worst ones being on his legs and on his right ankle—they were the worst ones, the primary ones. The diagnosis seemed obvious to me. And the second reason, probably more important, is that his skin has never cleared completely so it is normal, and to do a patch test on that skin would risk blowing him up again so that a positive patch test could have relighted the dermatitis and made him much worse.
>
> "Q. For medical reasons then you felt it was neither indicated nor necessary?
>
> "A. That is right."

Three chemists who worked in the fertilizer field were called by the appellant. They testified that the process used by Land O'Lakes was similar to the processes used elsewhere in the industry; that they had considerable contact with and had suffered no personal reaction from fertilizer thus produced and had heard of no case in which others working in the industry had been so affected. They expressed an opinion that in their concentration and condition none of the ingredients produced by either the use of anhydrous ammonia or Solution 490 would cause an injurious reaction when applied to the human skin. Their testimony generally negatived that of Mr. Calva and Dr. Sevenants. Other witnesses for the appellant testified to having had considerable contact with the fertilizer with no ill effects.

 This being a diversity case, we look to the law of Minnesota as controlling. The duty or responsibility of the manufacturer or compounder of products containing harmful ingredients and which are offered for sale to the public has been expressed by the Supreme Court of Minnesota in McCrossin v. Noyes Bros. & Cutler, 1919, 143 Minn. 181, 173 N.W. 566, at page 567, where that court stated:

> "* * * Substances or compounds imminently dangerous, *no matter for what use intended,* may not be placed before the public without due care to warn against the inherent dangers.
>
> "* * * as a general rule, the manufacturer or compounder of articles for the market, containing deadly ingredients or qualities, owes a duty to those into whose hands the articles may come to suitably convey notice of the danger, so that proper precautions may be taken to prevent a wrongful use and consequent injury. This is generally done by naming or properly labeling the package in which the articles are marketed. In Hasbrouck v. Armour & Co., 139 Wis. 357, 121

N.W. 157, 23 L.R.A.(N.S.) 876, the law is stated thus:

> "'A manufacturer or vendor, putting out and selling articles inherently dangerous, such as explosives or poisons, without notice to others of their dangerous nature and qualities, or with a misleading notice, or negligently in any other way, is liable for any injury to any third person which might have been reasonably foreseen by the manufacturer or dealer in the exercise of ordinary care.'" (Emphasis supplied.)

In the more recent case of Atkins v. Jones & Laughlin Steel Corp., 1960, 258 Minn. 571, 104 N.W.2d 888, the complaint alleged that on or about May 18, 1958, the plaintiff, a truck driver, while hauling and unloading a certain product distributed by the defendant, Montanin Company, Inc., known as "Montanin", had been injured as the result of negligent, careless and unlawful acts of the defendant. While that case, in its then posture, was primarily concerned with the Minnesota court's jurisdiction over a foreign corporation, Mr. Justice Gallagher stated the applicable Minnesota law at page 892 of 104 N.W.2d as follows:

> "It is well settled that a manufacturer, regardless of privity of contract, is liable to an ultimate user of his product or to others who may reasonably be expected to be in the vicinity of its probable use for injuries arising from his negligence in the manufacture or containment of the product."

Citing Lovejoy v. Minneapolis-Moline Power Implement Co., 1956, 248 Minn. 319, 79 N.W.2d 688; Heise v. J. R. Clark Co., 1955, 245 Minn. 179, 71 N.W.2d 818; Wright v. Holland Furnace Co., 1932, 186 Minn. 265, 243 N.W. 387; Ellis v. Lindmark, 1929, 177 Minn. 390, 225 N.W. 395; Smith v. Peerless Glass Co., 1932, 259 N.Y. 292, 181 N.E. 576; Prosser, Torts (2 ed.) § 84.

 See also Krueger v. Knutson, 1961, 261 Minn. 144, 111 N.W.2d 526,

and Ford Motor Co. v. Zahn, 8 Cir., 1959, 265 F.2d 729, at page 731, which case also involved the law of Minnesota, where Judge Matthes, speaking for this court, said:

"By force of law there is imposed upon the manufacturer of an article for sale or use the duty to exercise reasonable care to prevent defective conditions caused by a miscarriage in the manufacturing process. This duty requires reasonable skill and care in the process of manufacture and for *reasonable inspection or tests* to discover defects. Harper & James, Law of Torts, Vol. 2, § 28.11; Restatement of Torts § 395; and see, Egan Chevrolet Co. v. Bruner, 8 Cir., 102 F.2d 373, 122 A.L.R. 987; MacPherson v. Buick Motor Co., supra [217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696], and cf. Ellis v. Lindmark, 177 Minn. 390, 225 N.W. 395; Lovejoy v. Minneapolis-Moline Power Implement Co., 248 Minn. 319, 79 N.W.2d 688."

Frumer & Freidman's Products Liability states the general rule at § 8.01 as follows:

"§ *8. Duty to Warn*

"§ *8.01 In General.* The manufacturer's duty is not just to use reasonable care in designing or manufacturing his product. There may be a duty to warn even though the product is perfectly made. Many cases apply the rule that the manufacturer is under the duty to adequately warn of foreseeable and latent dangers attendant upon proper and intended use of his product. In fact, in some failure-to-warn cases no contention is made that there was any defect in the product. And more often than not, proof of negligence as to defective construction or improper design presents more difficulties than proof of negligence in failing to warn.

"It is clear that this area of products liability—duty to warn—is one which is rapidly expanding. Lawyers in recent years have become more aware of this duty. There has perhaps been greater judicial recognition of the fact that the manufacturer must keep abreast of scientific advances and is under the duty to make tests to ascertain the nature of his product. In this scientific age the manufacturer undoubtedly has or should have superior knowledge of his product. More and more complicated products with potentiality for harm if not properly used are being sold to relatively inexperienced laymen. But the manufacturer may hesitate to warn, for fear of scaring the customer away. * * * "

See also Restatement of Torts, §§ 388 and 395, and 1948 Supplement thereto.

 Obviously the jury found the appellant was negligent; that its negligence consisted in failure to warn and also in careless bagging and handling of the fertilizer; and that such negligence was a proximate cause of appellee's injury. The question before the trial court on the motion for judgment notwithstanding the verdict and before this court on appeal is, then, whether the evidence is sufficient to permit or sustain such findings. The appellant argues elaborately and at length that the ingredients found in 5–20–20 fertilizer could not possibly be harmful to human skin in the proportions therein contained.[3] Nevertheless, we may not go outside the record to which this review is confined. That we might draw different inferences or arrive at a different conclusion is immaterial, since we may not substitute our judgment for that of the jury on disputed issues where substantial testimony supports either of two

---

3. However, Stocker's testimony and the tests of the State of Minnesota indicate that there were considerable variances in the manufacturing process in 1958 and the jury could reasonably conclude that this would substantially affect the proportions of all ingredients found in the 5–20–20 fertilizer during that year.

conclusions. See Lavender v. Kurn, 1946, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Tennant v. Peoria & P. U. Ry. Co., 1944, 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520, rehearing denied, 321 U.S. 802, 64 S.Ct. 610, 88 L.Ed. 1089; and Ahmann v. United Air Lines, Inc., 8 Cir., 1963, 313 F.2d 274. The evidence of witnesses Sevenants and Calva, experts in their field, permits the jury's conclusion that the fertilizer contained primary irritants when applied to human tissue with heat, irritation and moisture present and that Hungerholt's injuries were a direct and proximate result of the fertilizer falling into his boot, and that the appellant was guilty of negligence in failing to warn by label or otherwise of the possibility of injury. A fertilizer product is, of course, not intended to be applied to the human skin but it is obviously foreseeable that skin contact would be a common incident to the use and handling of any such granulated material. Furthermore, the torn condition of some of the bags would add to the frequency and extent of such contact. The basic question is simply this: Did the fertilizer contain chemicals which could be harmful to the human skin? The appellee's experts gave it as their opinion that it did. Appellant's experts testified to the contrary. The jury accepted the opinion of appellee's experts and did so on evidence sufficient to support such a conclusion. We accordingly find the District Court properly applied the law of the State of Minnesota and committed no error in denying appellant's motions.

As an additional defense, appellant claims that if Hungerholt in fact sustained any injury or illness or suffered any damage whatsoever it was proximately caused or contributed to by his own negligence and carelessness and that it should be so held as a matter of law. The determination of whether contributory negligence exists is a matter coming clearly within the province of the jury. It is only where the evidence is such that the minds of reasonable persons could come to but one conclusion that a court may withdraw the question from the jury's consideration. The evidence here with reference to contributory negligence would most certainly not justify a court in making that determination as a matter of law. Krueger v. Knutson, 1961, 261 Minn. 144, 111 N.W.2d 526, 531. See also United States v. Stoppelmann, 8 Cir., 1959, 266 F.2d 13, 18–20, and Farmers Union Federated Coop. Ship. Ass'n v. McChesney, 8 Cir., 1958, 251 F.2d 441, 447. Hungerholt is a truck driver who was completely unfamiliar with the chemical properties of 5–20–20 fertilizer and of any danger or harm that might come to him through contact with it under the circumstances as they existed on September 8, 1958. He had handled the appellant's products for some months without any indication to him of any danger therein. He obviously was unaware of the cause of his condition until he went to Dr. Sevenants in March of 1959. Certainly, it could not be held as a matter of law that he was guilty of contributory negligence for returning to work after the first difficulty following the September 8, 1958, infection. He did not know and he had had no warning. In Wright v. Carter Products, 2 Cir., 1957, 244 F.2d 53, the court had before it a case in which the plaintiff had become infected through the use of Arrid. Subsequently she renewed its use and there resulted another infection. What was said by the United States Court of Appeals for the Second Circuit seems particularly applicable here on the question of contributory negligence. 244 F.2d page 60:

"Again, we believe the trial court misapplied the concepts of contributory negligence and of assumption of risk to the facts of this case. As has been pointed out by two discerning commentators, 'Though these time-honored defenses are frequently invoked to defeat recovery, they are theoretically inapplicable when the defendant's breach of duty is based on failure to warn. To allow these defenses is to indulge in circular reasoning, since usually the plaintiff cannot be said to have assumed a

risk of which he was ignorant or to have contributed to his own injury when he had no way of reasonably ascertaining that the danger of injury existed.' In the case at bar, Mrs. Wright had used Arrid regularly for five years without mishap. Then after one particular application she noticed a slight rash under her arms. She discontinued the use of this deodorant for several months, but on resuming its use she at first suffered no ill effect. A second application several days later precipitated the serious injury for which she now seeks recovery. In view of (1) her long and satisfactory experience with Arrid before the occurrence of the first rash, (2) her apparently harmless use of Arrid on the first application subsequent to contracting the rash, (3) her justifiable reliance on the defendant's well publicized assertions of the 'harmless' nature of its product, and (4) the relative unfamiliarity of the average housewife with the chemical mysteries of the cosmetics applied periodically to her person, we do not agree with the finding that Mrs. Wright assumed the risk of her injury or contributed negligently to its occurrence."

We conclude here that there is room for honest difference of opinion among reasonable men and accordingly the jury's determination that Hungerholt was not guilty of contributory negligence must stand.

In connection with the charge that the trial court erred in refusing to grant a mistrial on account of the misconduct of appellee's counsel, appellant contends:

"Throughout the trial, the defense was forced to object repeatedly to plaintiff's counsel's use of textbooks in cross examination. Each objection was sustained. So far as these rulings went, they were correct and in accord with Farmers Union Federated Coop. Ship. Ass'n v. McChesney (C. A. 8th), 251 F.2d 441, * * *."

It is appellant's contention that each time one of the questions was asked appellee's counsel would display a book to the witness and that:

"* * * the making of the necessary objection had the effect of emphasizing to the jury that there was a book on the subject, that it seemed—to plaintiff's counsel at least —to be an authority, and that the defense had the temerity to object and keep the knowledge in the book from the jury. The effect was obviously prejudicial to the defense."

An examination of the record indicates that appellee's counsel, in conducting his cross-examination of appellant's expert witnesses, was attempting to lay a foundation for the introduction of certain textbooks and other publications dealing with the subject about which the experts were in disagreement. As a part of the laying of the foundation for the introduction of the textbooks, etc., it was necessary, of course, to ask the witness if he was familiar with the text and if he recognized it as an authority on the subject. Upon being unable to lay a foundation necessary for admission, the court sustained each of the appellant's objections. Accordingly, there can be no claim of error insofar as the court's rulings were concerned. The record does not indicate to us that the exhibition of the books to the witnesses or the questioning with reference thereto in attempting to lay a foundation for their admission was done in any such manner as to be prejudicial to the appellant. The determination of that question was, of course, within the sound discretion of the trial judge. The record discloses no abuse of such discretion. Judge Donovan's rulings were eminently correct in each instance and his conduct and control of the case exemplary.

All claims of error raised by the appellant have been considered and have been found to be without substantial merit

This case is affirmed.