Charles A. COHAGAN, Appellant,

v.

LACLEDE STEEL COMPANY, a Corporation, and Park Transportation Co., a Corporation, Respondents.

No. 46453.

Supreme Court of Missouri,

Division No. 2.

Nov. 10, 1958.

L. A. Robertson and Ernest E. Baker, Alexander & Robertson, St. Louis, for appellant.

Evans & Dixon, William Wallace Evans, St. Louis, for respondent, Laclede Steel Co.

Heneghan, Roberts & Cole, John J. Cole, St. Louis, for respondent, Park Transp. Co.

STORCKMAN, Presiding Judge.

This is a personal injury action seeking the recovery of damages in the sum of $35,000. At the close of plaintiff's evidence, the trial court directed a verdict in favor of both defendants and the plaintiff has appealed.

On March 7, 1949, a shipment of steel purchased from the defendant, Laclede Steel Company, was delivered to the premises of Steel Sales Company in St. Louis. The original order for the steel had specified that delivery was to be made by railroad in a gondola freight car; but for some reason not shown by the evidence and not material to the action, delivery was made by the defendant, Park Transportation Company, using a motor tractor and trailer unit, which for convenience will sometimes be referred to as the truck. The steel consigned to Steel Sales Company consisted of strips 16 feet long, 1½ inches wide and about ⁵⁄₁₆th of an inch thick. Each strip weighed about 15 pounds. The strips were in two bundles, one weighing 4,590 pounds and the other 4,994 pounds. The bundles were held together by steel wire wrapped around them in three places, at each end and in the middle. The wire was wrapped around twice and then tied by being twisted.

The truck driver drove the cargo of steel to the usual unloading place on the premises of Steel Sales Company, got off the truck and stood on the dock nearby. Two regular warehouse employees of Steel Sales Company undertook to unload the bundles of steel strips by means of an overhead crane and other equipment belonging to Steel Sales. One of the employees got on the truck and placed hooks, attached by chains to the crane, under the wire wrappings at each end of the larger of the two bundles. Another employee of Steel Sales started the crane and had lifted the bundle of steel about a foot or a foot and one half above the truck bed when the wire wrapping around one end of the bundle broke. The plaintiff, also a warehouse worker employed by Steel Sales Company, was approaching the truck from the rear and was struck on the head by either the chain or the broken wire wrapping. His left eye was so severely injured that the sight of that eye was entirely lost.

The plaintiff contends that a submissible case was made as to each of the defendants. Essentially, the charges of negligence which the plaintiff seeks to establish are that (1) the "defendant, Laclede Steel Company, negligently manufactured and bundled the steel with defective wire," (2) the defendants supervised and controlled the loading of the steel and negligently selected defective and insufficient blocks and failed to secure the bundle of steel on blocks, and (3) the defendant, Park Transportation Company, negligently undertook to lift the bundle of steel by hooking onto the wire bands around the bundle.

■ The appellant correctly contends that negligence does not become a question of law alone, unless the acts on which its existence depends are of such character that all reasonable men would concur. Venditti v. St. Louis Public Service Co., 362 Mo. 339, 240 S.W.2d 921, 926 [6]. Further where a verdict is directed for the defendants at the end of plaintiff's case, the appellant plaintiff is entitled to have the

evidence reviewed on appeal in the light most favorable to him.

Plaintiff contends the fact that the wire broke in these circumstances is proof that it was defective, but does not further particularize the nature of the flaw or defect. The wire was not produced nor is there any evidence of an examination to determine the nature of the alleged defect. In his printed argument the plaintiff states: "The evidence in this case is sufficient to support a finding that the wire broke due to a defect therein, and that defendant could have discovered the defect by reasonable tests and inspection." The Missouri cases upon which the plaintiff chiefly relies in this respect are Zesch v. Abrasive Co. of Philadelphia, 353 Mo. 558, 183 S.W.2d 140, 156 A.L.R. 469, and McLeod v. Linde Air Products Co., 318 Mo. 397, 1 S.W.2d 122. See also the second appeal in the Zesch case, 354 Mo. 1147, 193 S.W.2d 581. The first Zesch appeal, following McLeod, states the rule of decision in this fashion, 183 S.W.2d 145 [12]: "It is said that if the nature of a thing manufactured is such that, when lawfully used for the purpose for which it is manufactured, it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger and the manufacturer of this thing of danger is under a duty to make it carefully. [citing cases] And given an article which may contain a latent imperfection making the article reasonably certain to be a thing of danger (though it is carefully manufactured), where it is shown that the imperfection could be disclosed by a test, it would seem reasonable that the manufacturer in the exercise of ordinary care would be under a duty to make the test."

Thus the initial requirement of the rule is that the use being made of an article or product must be the purpose for which it was manufactured or, as stated in the McLeod case, the application being made of the thing must be its intended use. In the Zesch case, the abrasive cutting wheel which shattered and injured the plaintiff was designed for the purpose of cutting metal with its periphery or edge, but because of the thin construction of the wheel it was not designed to sustain grinding pressure on its sides. The issue was whether the plaintiff was using it properly; that is, whether he was cutting with its edge or was applying pressure to the sides of the wheel. In the case at bar, the use being made of the wire binder is not in dispute, but the question presented is whether there is substantial evidence in the record that such use is one for which the wire wrapping was designed or intended.

The record is conclusive that the primary purpose of the wire binder was to hold together the more than 300 strips or pieces of steel in the bundle. There is no evidence of any agreement, express or implied, on the part of Laclede Steel to wrap the bundle with wire of such strength that it could be hooked into and be safely used as an anchor or handle for lifting the bundle of steel from the truck with an overhead crane. The "record of the Laclede Steel Company, sent to the Steel Sales Corporation," presumably a confirmation of the order, has the notation "Type 5 Bundling," but this term is not further explained in the record. Nor is there substantial evidence of a custom or usage imposing a duty on Laclede Steel to recognize the attempted use as a proper or intended use.

Much of the testimony on this, as on other issues, is vague and indefinite and often contradictory. This may be accounted for, at least in part, by the fact that the case was tried more than eight years after the accident occurred. Park Transportation's driver, George S. Connor, was the only witness who testified with respect to the loading of the steel at the Laclede Steel plant in Alton, Illinois. It was loaded on the truck by means of a crane owned by Laclede Steel Company and operated by its employees. Driver Connor directed the distribution of the load on the trailer so that the weight on each axle would not be in violation of state regula-

tions. The Laclede Steel Company had a supply of blocks for putting under the steel loaded onto trucks. These blocks were 4 x 4 inches; some of them were 4 feet long and others extended the entire width of the truck. Mr. Connor's best recollection was that the steel was placed on blocks when it was loaded. Putting blocks under the steel was for the convenience of the customer. By this means, it could be economically and conveniently unloaded.

A safe method of unloading bundles of steel such as these was to put cables or chains around the steel at each end of the bundle and lift it off the truck by means of an overhead crane. Connor often called at the Laclede Steel plant to pick up loads of steel and on occasions he had "seen them pick up steel at their place" by hooking onto the wires wrapped around the ends of the bundles. He did not know whether the bundle of steel was off the blocks when he arrived at the Steel Sales Company. The only way the steel could be unloaded as a bundle without using an overhead crane was to take the stakes off the side of the truck and roll the bundle off.

Charles W. Sims had been employed by Steel Sales Company for twenty-two years as a truck driver and as a general warehouse worker; his duties included unloading trucks. When the shipment of steel arrived at Steel Sales plant, the truck driver got off the truck and stood on the dock alongside of the truck. Mr. Sims got on the truck and Raymond Perry, another warehouse employee of Steel Sales Company, operated the overhead crane. Sims testified that there were two strands of wire around each end. It was either 3 or 4 guage wire. He intended to place chains or cables under the bundle and lift it off the truck by this means but he could not do so because the steel was laying flat on the truck. Since he was unable to get chains or cables underneath the bundle, he hooked onto the wires as a "last resort." He placed the hooks under both wires, stood to one side of the truck and told Perry to raise it. The bundle had been raised off the bed of the trailer

about twelve to eighteen inches when the front wire broke; that is, the one closest to the front of the truck.

Directly on the present issue, Mr. Sims testified that on other occasions at Steel Sales Company he had seen wrapping wires on steel bundles hooked onto and had seen the practice followed at other plants generally throughout the area, but he had never before seen a wire break from lifting a bundle that way. Later during his examination, however, Mr. Sims testified that he had never before hooked under any wire or band around a bundle of steel and had never seen anybody else at Steel Sales Company do so before the occasion in question. Sims further testified that he was trying to lift the whole bundle straight up by the wrapping wires and was trying to unload it by that method. He was not trying to lift one end up so that he could put blocks under it. He was lifting the bundle at both ends.

The purpose of having blocks under the bundle of steel is so that chains or lifts can be put under it and lift the bundle off without unloading it by hand. Sims did not receive any instructions from the truck driver or from anyone else as to how he should unload the cargo of steel. The crane operator did not testify and Sims did not know how much pressure the operator of the crane was exerting. At one place Sims testified that the bundle being lifted was not fouled up or jammed against any other bundle; but on further examination stated that he did not know if it was hooked onto or tied in with any other bundle. The witness Sims offered no explanation of the conflicts in his testimony.

"Where a party relies on the testimony of a single witness to prove a given issue, and the testimony of such witness is contradictory and conflicting, one version thereof tending to prove the issue, the other tending to disprove it, with no explanation of the contradiction, and no other fact or circumstance in the case tending to show which version of the evidence is true, no

case is made, and the jury should not be permitted to speculate or guess which statement of the witness should be accepted." Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644, 647 [6].

The only other witness testifying on this issue was the plaintiff himself. He had been a warehouse worker for Steel Sales Company for about nineteen years. The accident happened near quitting time, about 3:30 or 4:00 o'clock. The plaintiff was not assisting with the unloading and had been in another part of the building. He was approaching the truck when the accident happened. He saw Sims kneeling down at the front end of the bundle and "judged he was attempting to get a cable, or something, under the bundle of steel." Sims got up from that position and the plaintiff saw him hook the chain. The crane being used had a lifting capacity of 5 tons or 10,000 pounds. As the plaintiff approached, he saw one end of the bundle raised off the floor of the trailer. He testified that the proper and safe way to unload a bundle of steel that is on wooden blocks is to put cables or chains underneath the bundle. When the steel is not on blocks but flat on the bed of the truck, the employees try to get a block under the bundle so they can put the cables under the bundle. This was being attempted by hooking under the wire on the occasion when this accident happened. Plaintiff further testified that in all the years that he had done this type of work he had never attempted to put a hook under the wire wrapped around a bundle of steel, although "I think that was done on a lot of occasions." The force exerted by the crane in lifting is controlled by the crane operator.

The plaintiff further testified that when a bundle is to be lifted completely off the trailer, two chains should be placed on the bundle so that there would be a sling at each end. The steel could have been carried off the truck by hand but it would have been a much slower method and not approved. by management. He had never been instructed by management either to

hook under the wire or not to hook under the wire. Nothing but the time feature would have prevented the two men from unloading the bundle by hand. The plaintiff had never attempted to raise a bundle of steel by hooking the chain hook under the band and he never seen a bundle raised by the band at Steel Sales Company. Hooking under a wire or a band should only be done as a last resort in an unusual situation. The plaintiff admitted that he testified in his deposition: "Well, as a matter of safety, it isn't proper, although, I understand they do it a lot of places but it is a practice we never followed there, and I think, to my knowledge, the time that this happened is the only time to my knowledge that it was done there. And it bears out my thought that it isn't safe." He said that was his personal opinion.

Mr. John N. Ong, Jr., a metallurgical engineer, testified with reference to "the tensile strength of hot rolled low carbon wire" of the type with which the bundle was bound. For one strand of No. 3 guage wire, he "figured the strength of 2340 pounds", for No. 4 guage, he "calculated that strength to be 1990 pounds", and for No. 5 guage, his "calculation was 1685 pounds." Two strands of wire would support just twice that much weight. If there were four strands around at the point of lift, the wire would lift four times the strength as one single strand of wire. The generally accepted method of testing such wire is to take a sample section off the end of the roll of wire and subject it to a number of tests. However, every single portion of the wire cannot be tested because the test is destructive of the wire itself. The manufacturer can only make a test of a representative section of the wire. Mr. Ong further testified that a wire wrapping of this sort is "a fairly soft wire" and a crane hook is made of "a very hard metal substance."

On this record we find no substantial evidence that the wire wrapping was designed or intended to be used as an anchor or means of lifting the bundle of steel as

was attempted in this case. The fact that such wire wrapping may have been misused with impunity on isolated occasions does not tend to establish a duty on the part of the manufacturer to make the wire in such manner that it can be safely misused. Plaintiff's evidence has other shortcomings which need not be explored in view of our finding on this issue.

The next allegation of negligence is that the defendants "negligently selected defective and insufficient blocks and negligently failed to secure the bundle of steel on the blocks upon which it was loaded by a binder or blocking." The evidence on this issue most favorable to the plaintiff tended to show that the bundle of steel was "laying flat on the truck", or at best was partially on a block at one end. In any event, it was in such a position that the warehouse employee Sims could not get a cable or chain underneath it.

█ We do not need to determine whether there was a sufficient showing of negligence in loading and transporting the bundle of steel, because we have concluded that the negligence asserted was not the direct and proximate cause of the plaintiff's injury. The efficient and producing cause of the injury was the act of the employees of Steel Sales Company placing the hard metal hook under the comparatively soft wire binder and undertaking to lift the bundle of steel by means of · the crane. When this occurred, the alleged negligent acts of the defendants in loading and transporting had ceased to be active.

In Duke v. Missouri Pacific Railroad Company, Mo., 303 S.W.2d 613, 617 [4]; this court held: " 'Where a second actor has or should have become aware of the existence of a potential danger created by the negligence of an original tort-feasor, and thereafter, by an independent act of negligence, brings about an accident, the first tort-feasor is relieved of · liability, because the condition created by him was merely a circumstance of the accident and not its 'proximate cause.' 65 C.J.S. Negligence §111b, notes 44, 45, p. 692."

The warehouse employees of Steel Sales Company were aware of the fact that cables and chains could not be passed beneath the bundle and that there was potential danger in hooking onto the comparatively soft wire wrappings with the hard metallic hook and undertaking to raise the bundle by means of the overhead crane. They could have unloaded the steel by hand, rolled it off the side of the truck, or perhaps taken other measures that would have avoided the risk of breaking the wire binder. The alleged negligence in delivering the bundle of steel without sufficient blocking was not the proximate cause of the plaintiff's injury. Duke v. Missouri Pacific Railroad Company, supra; Smith v. Mabrey, 348 Mo. 644, 154 S.W.2d 770.

█ The plaintiff also contends that: "The jury could have properly found from the evidence that defendant Parks Transportation Co. was negligent in lifting the bundle of steel by hooking onto the wire bands around the bundle", citing the case of Boehm v. General Electric Co., 179 Mo. App. 663, 162 S.W. 723. However, the evidence does not show that the negligent act of hooking onto the wire bands was one for which defendant Park Transportation Company was responsible. Plaintiff's attempt to elicit testimony that the driver for Park Company retained some direction and control of the unloading process where the entire cargo was not for one consignee was unsuccessful. The total effect of this testimony was that the driver was supposed to point out what part of the cargo was for a particular consignee when this was not known.

All the witnesses agreed that driver Connor got off the truck and stood on the dock while the warehouse employees of Steel Sales Company undertook the task of unloading. All of the evidence was to the effect that this was part of their regular duties. The evidence does not tend to show that defendant Park had the right or .duty to direct and control the method of unloading the bundle of steel. Nor does it show that the driver of this defendant undertook

to do so. The record is quite clear that the decision to hook under the wires and attempt to unload by this means was solely that of the warehouse employees of Steel Sales Company.

We have considered all questions raised by the appellant plaintiff and consider them to be without merit. Accordingly the judgment of the trial court is affirmed.

All concur.