Grace Elaine McC. BUTLER, as Adminis-
tratrix of the Estate of John Carlton
Butler, Deceased, Plaintiff-Appellee,

v.

L. SONNEBORN SONS, INC., Defendant-
Appellant.

No. 18, Docket 26905.

United States Court of Appeals
Second Circuit.

Argued Oct. 30, 1961.

Decided Nov. 20, 1961.

William F. McNulty, New York City
(Stanley D. Hicks), New York City, for
appellant.

Donald E. Klein, New York City (Mar-
vin Schwartz, New York City, of coun-
sel), for appellee.

Before CLARK, FRIENDLY and
MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge.

Defendant in this diversity of citizen-
ship action for wrongful death appeals
from a judgment for $57,500, entered in
the District Court for the Southern Dis-
trict of New York, after trial before
Judge Murphy and a jury.[1] The grounds
relied on are alleged insufficiency of evi-
dence of negligence, errors in the charge
and refusals to charge, and contributory
negligence of decedent as a matter of
law. We affirm.

Defendant has for many years manu-
factured in New Jersey, and marketed
on a nation-wide scale, a liquid floor
hardening material called Lapidolith.

[1]. Although defendant is the nominal appel-
lant, during the course of the trial it set-
tled, for $15,000, its liability to plaintiff
above its insurance coverage of $25,000.
In substance, therefore, the appeal is by
defendant's insurer.

For some thirty years the compound has been packaged in large steel drums. It was well known that contact between the liquid, itself noninflammable, and the steel would cause corrosion and the generation of free hydrogen, capable of being ignited by the smallest spark. To guard against these hazards the drums were coated with a protective lining, a precaution satisfactory unless the lining were damaged or dislodged. Each drum bore a label identifying the product as "Lapidolith, A Sonneborn Building Saver, The Patented Liquid Chemical Hardener for Concrete and Terrazzo Floors" and cautioning "Poison. Must not be used internally. Keep from freezing."

Defendant had won a subcontract to supply Lapidolith for a new warehouse at the United States Naval Air Station at Cherry Point, North Carolina, which was being built by Conn Structors as general contractor. Conn Structors had previously purchased drums of Lapidolith from defendant for use on another job, in South Carolina, eleven of which remained unused. Conn Structors having requested a credit for these drums, defendant agreed they might be used at the new job "providing the drums are unopened and in good condition." Accordingly Conn Structors shipped the drums from South Carolina to itself at Cherry Point. When they arrived, Wollard, Conn Structors' labor foreman, thought they looked "beat up" and "didn't have no new paint on 'em." Later Wollard found two of them leaking from the bottom. After they were turned upside down, holes were found in the bottom of each. Wollard asked the plumbing and heating subcontractor to furnish someone to weld the leaks. Butler was assigned. A sample of the contents was taken and tested for inflammability, with negative results; Smith, the subcontractor's foreman, also looked for warning labels and found none. Butler welded the first drum without incident. When he was engaged in striking his torch to weld the second, the drum blew up and Butler was killed.

On the issue of liability, plaintiff relied on the depositions of Wollard and Smith, and also of Sinclair, a safety engineer employed by the Marine Corps. His examination of the exploded drum disclosed that parts of the protective lining had been worn off for some time and the steel had become corroded; his conclusion was that the reaction of the liquid and the metal had built up sufficient hydrogen to cause an explosion, either from the heat left in the torch after the welding of the first barrel, or from the spark of the torch, or from a combination of the two. Defendant called two witnesses. An employee testified that, in his experience of forty years, although "the mechanics will smoke, light matches, * * we have never encountered the slightest difficulty with Lapidolith on any job." An engineer, who was a member of the American Welding Society, gave expert testimony that the procedure followed by Butler was unsafe.

The Interstate Commerce Commission, acting under authority conferred primarily by 18 U.S.C. § 835, has promulgated detailed regulations, 49 C.F.R. Parts 71–78, to be observed by shippers in order "To promote the uniform enforcement of law and to minimize the dangers to life and property incident to the transportation of explosives and other dangerous articles by common carriers engaged in interstate or foreign commerce," 49 C.F.R. § 73.1(a). ICC Reg. § 73.402 requires labels, of various texts and colors as therein provided, for "any dangerous article as defined by Parts 71–78." Lapidolith, in view of its conceded chemical properties, seems to be a corrosive liquid under § 73.240, so that, under § 72.2 it must be shipped in compliance with the regulations. The required label appears to be the white label listed in § 73.407(2):

| Caution | Do Not |
|---|---|
| Corrosive Liquid | Drop |

Do not load with Explosives or near articles bearing Yellow labels

The judge reserved decision on a motion by defendant for a directed verdict at the close of plaintiff's case and again

at the end of the whole case; after the verdict for the plaintiff, he denied a motion to set it aside.

In his charge Judge Murphy referred to the plaintiff's claim that defendant should have had on the drum "some sign or legend to the effect that warning was given to keep it away from heat or fire," and to the I. C. C. requirement that a barrel containing acid or caustic fluid must contain a label "with the word 'Caution' in rather large letters in the center of the label and the words 'Acid' or 'Caustic Fluid' prominently displayed," which he later supplemented, at plaintiff's request, with the words, "Do not drop." He said, "the first question that you have to decide is whether the absence of either the required label under the I. C. C. regulations or the warning label that plaintiff suggests was negligent conduct on the part of the defendant." Continuing, he charged that the jury must decide in the first place "whether, in the exercise of due care, the defendant manufacturer should have foreseen the contingency of the lining wearing or tearing away without its fault, and to guard against any danger that might thus be created. Should they have placed warning labels of some kind on the drums as regards the proximity of flame or heat?" If the jury so decided, "then your next question is one of proximate cause, that is, whether defendant could reasonably have foreseen this type of accident. In other words, was the defendant's conduct such that the reasonable and prudent man would have foreseen the possibility of the lining breaking, hydrogen forming, and someone coming in contact with it by means of fire or heat." In the event of a finding favorable to plaintiff, "then you must also find in this case that but for the absence of the label, that is, the I. C. C. label or the label that was suggested by the plaintiff, that the decedent would not have come into close proximity to the drums with his acetylene equipment, with spark, heat or flame, whatever you find from the evidence was the case, and that his coming into proximity in fact was the cause of the accident." Finally, in order to bring in a verdict for the plaintiff, the jury must find that decedent was not contributorily negligent. Appellant took an exception "to the charge that refers in any way, shape, manner, or form to the I. C. C. requirement," and other exceptions not material, as well as excepting to the judge's refusal to charge certain requests.

█ Appellant's claims, presented in its requests to charge and also as objections to the sufficiency of the evidence, that its method of packaging Lapidolith had not been proved unsafe, and that it was not bound so to package the compound as to withstand what it contends to have been unforeseeable mishandling by Conn Structors, misconceive the theory on which the case was submitted to the jury. This was not that appellant had failed in its duty to package its product in a reasonably safe manner—indeed, no suggestion of any better manner has been made—but rather that it had neglected to perform the small additional task of affording appropriate warnings that care in handling the product was needed, both to prevent it from becoming dangerous and to protect if it had. A duty to warn, under circumstances not dissimilar to those here presented, has been widely recognized.[2] True, a manufacturer of an

2. Tingey v. E. F. Houghton & Co., 30 Cal.2d 97, 179 P.2d 807 (1947); Gall v. Union Ice Co., 108 Cal.App.2d 303, 239 P.2d 48 (Dist.Ct.App.1951); Tampa Drug Co. v. Wait, 103 So.2d 603 (Fla. 1958); Tomao v. A. P. De Sanno & Son, Inc., 209 F.2d 544 (3 Cir.1954) (applying Mass. law); Orr v. Shell Oil Co., 352 Mo. 288, 177 S.W.2d 608 (1943); Martin v. Bengue, Inc., 25 N.J. 359, 136 A.2d 626 (1957); Rosebrock v. General Electric Co., 236 N.Y. 227, 140 N.E. 571 (1923); Rosenbusch v. Ambrosia Milk Corp., 181 App.Div. 97, 168 N.Y.S. 505 (1st Dep.1917); McClanahan v. California Spray-Chemical Corp., 194 Va. 842, 75 S.E.2d 712 (1953); Restatement, Torts §§ 388 comment g, 394, 397; 2 Harper & James, The Law of Torts (1956), pp. 1547–1548 and cases cited fns.

ordinarily safe article is not held to that degree of clairvoyance which hindsight alone can give. But, especially when injury is likely to be serious if trouble occurs, even slight foreseeability may warrant, and a long history of good fortune will not necessarily exclude, a conclusion by the trier of the facts that prudence requires the manufacturer to take on so small an added burden. See Martin v. Bengue, Inc., supra, note 2. Here the drums were already labeled; a jury could reasonably decide that the chances of a drum's being roughly handled and then encountering mechanics or other workers who "will smoke, light matches" demanded amplification of the label to warn against both these hazards, quite apart from the reinforcement to such a conclusion which the I. C. C. regulation added.

Plaintiff was thus entitled to have the jury consider whether defendant had a duty to affix one or both of two sorts of warnings—against careless handling which might rupture the lining, and against the proximity of heat or flame which would produce untoward consequences if rupture there had been—and, if so, whether Butler's death had been proximately caused by defendant's breach of one or both such duties. Rather than being unduly favorable to the plaintiff, the charge seems to have been less favorable to her than it ought to have been; for it emphasized the second type of warning to, or at least nearly to, the exclusion of the first,[3] both on the issue of negligence and on that of proximate cause.

Defendant's criticisms of the judge's references to the I. C. C. regulation are unfounded. We need not consider whether, in view of the purpose stated in the statute with respect to "safe transportation" and its reference to "safety in transit," 18 U.S.C. § 835, the judge could properly have determined that Butler came within the class of persons intended to be protected, so that violation of the regulations would be negligence per se, Huckleberry v. Missouri Pac. R. R., 324 Mo. 1025, 26 S.W.2d 980 (1930); Wintersteen v. National Cooperage & Woodenware Co., 361 Ill. 95, 197 N.E. 578 (1935). Here the judge simply permitted the jury to consider breach of the regulations as evidence of negligence. For that more limited purpose, it is unnecessary that the injured person be within the precise class intended to be protected, American Law Institute, Restatement of Torts, 2d, §§ 288 and 288B (Tent. Draft No. 4, April 15, 1959). "Even if the statutory purpose doctrine limits the negligence per se rule, it does not necessarily follow that it should always preclude consideration of a statute which was not meant to govern the precise situation before the court. * * * This should be the result wherever the situation envisaged by the legislature and that in the case at bar are analogous enough, so that the ordinary canons of relevancy are met." 2 Harper & James, The Law of Torts (1956), p. 1005.[4] If plaintiff needed the support of a make-weight, we could find it in the undue breadth of appellant's exception to "the charge that refers in any way, shape,

---

2-8; Dillard & Hart, Product Liability: Directions for Use and the Duty to Warn, 41 Va.L.Rev. 145 (1955).

There is no contention that North Carolina law existing at the time of the cession of the Naval Air Station, whenever that was, differed from generally recognized principles of tort law, see James Stewart & Co. v. Sadrakula, 309 U.S. 94, 99–101, 60 S.Ct. 431, 84 L.Ed. 596 (1940), or that there has been any subsequent relevant Federal action.

3. Although, at plaintiff's request, the judge added the "do not drop" words in the

I. C. C. regulations, he largely destroyed their effect on the jury by making the comment "What connection it has with the case I don't know."

4. See also the entire discussion, pp. 994–1014; the pioneering article, Thayer, Public Wrong and Private Action, 27 Harv.L.Rev. 317 (1914); Morris, The Relation of Criminal Statutes to Tort Liability, 46 Harv.L.Rev. 453 (1933); and Morris, The Role of Administrative Safety Measures in Negligence Actions, 28 Texas L.Rev. 143 (1949).

manner or form to the I. C. C. requirement." However impressive the ring of so resounding an exception, it has no effect on appeal unless the charge is wholly bad; in that event, one noun would do the trick as well as four.

The testimony as to Butler's contributory negligence was in conflict; there was enough evidence that he did not act unreasonably, on the basis of what he knew, to create a jury issue. See Tampa Drug Co. v. Wait, supra, 103 So.2d at 609; Martin v. Bengue, Inc., supra, 25 N.J. at 373–376, 136 A.2d at 634–635.

Affirmed.