**SIMPSON TIMBER CO. and Grace Line, Inc., Appellants,**

v.

**Ezra PARKS, Appellee.**

**SIMPSON TIMBER CO., Appellant,**

v.

**GRACE LINE, INC., et al., Appellees.**

**No. 19673.**

United States Court of Appeals
Ninth Circuit.

Nov. 9, 1966.

Rehearing Denied Jan. 6, 1967.

**326**

Kenneth E. Roberts, of Mautz, Souther, Spaulding, Kinsey & Williamson, John R. Brooke, of Wood, Wood, Tatum, Mosser & Brooke, Portland, Or., for appellants.

John R. Brooke, of Wood, Wood, Tatum, Mosser & Brooke, Nathan J. Heath, of Gray, Fredrickson & Heath, Philip A. Levin, of Pozzi, Levin & Wilson, Portland, Or., for appellees.

Before CHAMBERS, BARNES, HAMLEY, JERTBERG, MERRILL, KOELSCH, BROWNING, DUNIWAY and ELY, Circuit Judges.

ELY, Circuit Judge:

A longshoreman stowing cargo was injured when he stepped through the packaging on a bundle of doors. The Simpson Timber Company manufactured the doors. In filling an order for an exporter it was required to package the doors for shipment overseas. The doors were cut to leave openings for glass. The manufacturer packaged the doors in a stack forty-two inches high, with the window openings aligned so that a well was formed. A cardboard cover was wrapped around the center of the stack leaving the solid edges of the doors exposed but concealing the interior cavity. The cardboard-bound stack was then bound with two steel straps and wooden chocks fastened along one side to permit the stack to be handled by a forklift tractor. The completed bundle appeared to consist of solid wooden doors wrapped in a protective cardboard cover. When the bundle rested on its chocks the concealed well created by the window openings extended vertically through the package from top to bottom. The manufacturer gave no warning that the cardboard cover concealed a well, by notice on the package or otherwise. Printing on the package identified the contents as "fine doors," and stated that the cardboard cover was not to be removed until the doors were unpacked for installation.[1] Simpson delivered the doors to the dock for the exporter. The exporter, who was in fact the shipper here, arranged that Grace Lines, Inc. convey the doors overseas in one of its ships, and the shipowner made a contract with an experienced stevedoring company for the loading of the ship's cargo. Longshoreman Parks was employed by the stevedoring company. The bundles were loaded without incident until the topmost layer was sought to be placed in the square of the hatch. Dunnage was not placed upon the bundles of doors. Since the bundles did not precisely and firmly fit within the square, the expert loaders chose to stabilize the top-most layer by placing sacks of flour between the bundles. In furtherance of this decision, Parks stepped upon the bundle carrying a sack of flour weighing one-hundred pounds. The cardboard cover did not withstand the weight, and the forty-two inch fall resulted.

The longshoreman filed an action in the Oregon state court. The shipowner and Simpson were named as defendants. Upon petition by both defendants, the action was removed to the District Court (28 U.S.C. § 1441), where jurisdiction rested on the basis of diversity of citizenship and the requisite amount in controversy. 28 U.S.C. § 1332. The ship-

---

1. This method of packaging doors for export had been used by Simpson in its prior overseas shipments of many thousands of doors. There is no record of an injury having been sustained by one participating in the transport of such a shipment prior to that sustained by Parks.

owner interpleaded the stevedoring company (the longshoreman's employer) as a third party defendant. Each of the three defendants made claims against the other. The main action was tried before a jury, it having been agreed that the indemnity claims would be determined by the judge following the jury verdict. The jury returned a verdict against Simpson and the shipowner. The district judge granted the shipowner indemnity from Simpson and denied Simpson indemnity from the stevedoring company. Simpson and the shipowner appeal. Our court derives its jurisdiction from 28 U.S.C. § 1291.

A panel of our court heard this appeal and affirmed the trial court. One of the panel dissented.[2] A petition for rehearing was granted, and the court determined that the appeal should be heard en banc.

There are three contentions which have commanded our principal attention. Both Simpson and the shipowner urge that the verdict and judgment award excessive damages to Parks.[3] Simpson presents two other main points, (1) that the district judge erred in denying its motion for a mistrial,[4] and (2) that an instruction given to the jury was prejudicially erroneous as to it.

The majority here holds that Simpson's point (2) is well taken and requires reversal. Since, upon remand, there must be a retrial, there is no need to review the contentions as to events which may not reoccur.

After the evidence had been given, Simpson moved for a directed verdict in its favor. It argued that it was under no legal duty to conduct inquiry as to stresses to which its package would be subjected because of stevedoring practices of which it had no knowledge. It reaffirmed its position in objecting to an instruction given to the jury as follows:

"If you find from a preponderance of all of the evidence before you that Simpson Timber Company knew, *or in the exercise of reasonable care should have known* that workmen might walk on said packaged doors, and if you further find that the manner of packaging the doors created a dangerous situation and that a reasonably prudent person under the same or similar circumstances would have supplied some reasonable form of weight bearing support over the hole so that a workman could not step through the cardboard into the hole or would have warned workmen of the danger who might walk on the doors in some manner of the hole underneath the cardboard in some reasonable means, and that the defendant failed either to supply reasonable weight bearing support or some reasonable warning, then such failure, if there was a failure, would be negligence on the part of the Simpson Timber Company." (Emphasis supplied.)

It is this instruction which the majority determines to have been erroneous. Under the facts as they appear, it embraced a principle which we cannot accept.

■ The instruction permitted the imposition of liability upon Simpson if the jury should determine that Simpson, before it delivered its doors to the dock, *knew* of the stevedores' practice of walking upon packages of cargo. This was proper. Used as a floor, or walking

---

2. See first sentence footnote 7, infra.

3. Parks were not hospitalized as a result of his injuries. The total medical expense for his treatment was $76.25. He was awarded damages of $80,000.

4. In his opening statement at the beginning of the trial, Parks' attorney told the jury, in effect, that following the accident, Simpson had improved its manner of packaging doors. Simpson immediately moved that the court declare a mistrial. The district judge later commented as to this point, "So I will have to take that chance with the consolation that if it is reversed on that basis, it wasn't my fault."

surface, the bundle of doors was a trap. If Simpson delivered the bundle with knowledge that it would likely be walked upon, then it might reasonably be held negligently to have breached a duty to the stevedores, including Parks. Simpson vigorously urges that there was insufficient evidence to support a finding that it had prior knowledge of the working practice. Upon careful review of the record, the majority concludes that Simpson's position in this respect is not well taken. It was shown that Simpson had a plant in the City of Portland and a warehouse in the waterfront area. For years Simpson had annually shipped 16,000 to 18,000 doors overseas (less than four percent of its volume), and its plant manager visited the warehouse an average of once every week or ten days. The plant manager testified that he had been on the dock and seen the holds of ships, and that he had "wondered" how cargo was moved to portions of the hold away from the hatches. From these circumstances, with reasonable inferences which might be drawn therefrom, the trier of facts could, in the majority's opinion, find sufficient basis for a determination that Simpson did, in fact, have knowledge of what is said to be the common working practice of longshoremen engaged in the stowing of cargo.

The instruction, however, also authorized the fixing of liability upon Simpson if the jury should determine that Simpson "in the exercise of reasonable care should have known that workmen might walk on said packaged doors * * *." Implicit in the instruction is the principle, believed by our majority to be incorrect, that Simpson had the legal duty to make inquiry as to the working practice of those who might handle its product.

If a common stevedoring practice exists in a particular port, no difficulty should be encountered in learning of it.

If a manufacturer or shipper is obliged to be aware of it and is not, it would hardly seem possible that he could successfully maintain that he exercised reasonable care.

Our problem, then, is generally concerned with the extent of the duty which rested upon Simpson, as manufacturer and packager, as to those whom it might reasonably expect would handle its product in the course of exportation. Put another way, to affirm the judgment as against Simpson would require affirmative answer to the question, may the manufacturer and packager of an article which is not inherently dangerous be justly held liable to a longshoreman who sustained injury, while loading the package aboard a vessel, as a result of using the package for a peculiar purpose not intended, anticipated, or known to the manufacturer?

■ An affirmative answer would, in turn, establish a principle, too far-reaching and onerous in application, that one who packs an item for shipment is burdened with a legal duty to ascertain the customary working practices of stevedores in any port which the purchaser, a shipper, or transporter might select for loading and embarkation. Acceptance of this proposition would require unprecedented extension of doctrines which impose liability upon manufacturers and a departure from those recognized tort rules which require no more than that a manufacturer packing his goods for shipment shall exercise ordinary care to eliminate hazards which are known [5] to him.

There is no authority which the majority is able to interpret as affording precedent for the imposition of the extended duty which was applied against Simpson in the case at hand. Long established and especial principles are justly applicable in so-called products liability cases wherein the product is in-

---

5. If a hazard is so obvious as to permit of no doubt that one could have anticipated it, then he may be held to the same responsibility that rests upon one to whom the hazard is "known." See 54 Geo.L.J. 1439, 1441 & n. 9 (1966).

herently dangerous or harmful. These principles are sound, but they cannot be appropriately applied to a case wherein the product is such an ordinarily harmless item as a package of doors, a product which cannot explode, ignite, strike, poison or cause skin diseases and which, without doubt, was not intended to be used, ultimately or at any time, as a floorway.

There is only one case in which the facts are closely analogous to these which meet us here. That case is Mc-Cready v. United Iron & Steel Co., 272 F.2d 700 (10th Cir. 1959). There, the defendant was a manufacturer of steel window casements. While a casement was being placed into a building under construction, an iron-worker, while shortening the outside flanges of the casement, used its crossbars as handholds and footrests. One of the crossbars did not withstand the stress, and the workman fell to his death. It was proved that, in the construction of buildings, iron-workers customarily and commonly ascend and descend casements by using the casements' steel crossbars as handholds and footrests; nevertheless, the court held, properly in our opinion, that the manufacturer was not liable. Said the Court of Appeals, "A manufacturer may assume that his product will be devoted to its normal use. And if it is safe when devoted to the normal use for which it was manufactured, he is not liable in damages for injury resulting from an abnormal or unusual use not reasonably anticipated." McCready v. United Iron & Steel Co., supra, 272 F.2d at 703. (Citations omitted.)

The product was intended for use as a window, not as a ladder. The manufacturer was not under a legal duty to investigate all customs, however universal, of construction workers who might participate in the erection of buildings where the window casements might be installed. He had no duty to follow his product through every avenue to its ultimate intended use. The principle of *McCready* is a sensible principle, soundly based upon traditional concepts of legal duty. Its reasoning guides to the determination here.

One other case deserves comment. It is Cohagan v. Laclede Steel Co., 317 S.W. 2d 452 (Mo. 1958), wherein the defendant steel manufacturer had packed steel strips in bundles which were wrapped in three places with steel wire. At their destination, the bundles were unloaded by the use of a crane. On the crane's cables were hooks which were placed under the two steel wire wrappings at the ends of the bundle to be lifted. While one of the bundles was being lifted from a trailer on which it had been transported to the consignee, the wire wrapping at one end of the bundle broke. There was evidence of a practice to lift bundles by attaching a crane's cable hooks to the steel wire wrappings, as there was evidence here of the custom and practice of using packages as walkways. The court held that the manufacturer was not liable to the consignee's injured workman. Missouri's Supreme Court remarked, "Thus the initial requirement of the rule [as to manufacturer's liability] is that the use being made of an article or product must be the purpose for which it was manufactured or, as stated in [McLeod v. Linde Air Prods. Co., 318 Mo. 397, 1 S.W.2d 122 (1927)], the application being made of the thing must be its intended use." 317 S.W.2d at 454. The court went on to emphasize that "the primary purpose of the wire binder was to hold together * * * pieces of steel in the bundle." 317 S.W.2d at 454. Here, the primary purpose of Simpson's wrapper, marked "fine doors," was "to hold [the doors] together" and to protect them from damage. If Simpson had no prior knowledge of the stevedoring practice, then it no more intended or anticipated that the bundle of doors would be put to use as a floor, to withstand any weight, however heavy, than did the manufacturer in *McCready* intend or anticipate that the casement would be used as a ladder or the manufacturer in *Cohagan* that the bind-

ers would be used as a lifting attachment.[6]

There is no force of legal reason or of social consideration which compels departure from traditional concepts and the teaching of *McCready* and *Cohagan*.[7]

▮▮▮▮ When a duty rests upon a manufacturer because of his knowledge of a working practice like that which was followed here, he might quite easily fulfill it. A simple warning would ordinarily suffice. When, however, his shipment is to be entrusted to expert loaders and expert carriers, it hardly fits fair standards to say that there should rest upon him the burden to anticipate every course which the product is to follow and to acquire knowledge, in advance, as to the uses to which his product will be subjected by reason of working practices, perhaps unique, or even strange, of those who are to handle it.[8]

6. We have recognized that when "Used as a floor, or walking surface, the bundle of doors was a trap" (supra, page 327), but the intended use of the package was to provide a covering that would protect the goods from damage and not to provide a floor or walkway for longshoremen. Any manufactured article, if wrapped in a manner too fragile to withstand an unintended use to which it may be subjected by reason of peculiar practice unknown to the packager, might become a trap. Here, the bundle of doors was a trap only because the bundle was being subjected to a use for which it was not designed or intended, a use arising solely from a stevedoring practice about which the jury was instructed the manufacturer was obliged to learn. If the doors' wrapper had been of sufficient strength to survive the weight of an ordinary man and if Simpson had made inquiry and ascertained the stevedores' practice of walking upon packages of cargo, would it also have been required to anticipate that a workman would walk upon the package while carrying a hundred-pound sack of flour or any other burden, of whatever weight, which might be chosen, in the instant, to pack and stabilize the packages in the square of the hatch? Would the manufacturer have the legal duty to anticipate that three or four or five longshoremen might walk or stand upon his package at the same time? Since in our case there is no evidence of stevedoring custom or practice to impose a particular weight upon packages being used as floors, we are asked, in effect, to apply a rule requiring that the manufacturer insure that his product be packaged in anticipation of whatever use to which it may be subjected by stevedores loading it as a part of a ship's cargo.

7. The majority and dissenting opinions of our original panel, although withheld from publication in the Federal Reporter, appeared in 1966 A.M.C. 1081. In slip form, they also came to the attention of others. See 66 Colum.L.Rev. 1190 (1966) and 54 Geo.L.J. 1439 (1966). The writer of the Columbia Law Review treatment would justify a requirement that the manufacturer take steps to learn of stevedoring practices upon the assumption that the manufacturer "can better spread the risk of loss."

On the other hand, the writer of the casenote in the Georgetown Law Journal observes, as to such a requirement, "Consideration of the number of persons who handle goods in commerce, their varying practices, and the distances goods are shipped indicates the enormity of this obligation." 54 Geo.L.J. at 1445. And, after reasoning that the burden of ascertaining the workmen's practices should justly fall on the stevedoring company, the writer concludes, "A blanket application of the * * * duty * * * would impose a heavy, perhaps intolerable, burden on the manufacturer or packer." 54 Geo.L.J. at 1446.

8. Let us suppose that a manufacturer packages fine glassware and sells it to an exporter who chooses a certain port as the place for export. If it should be the practice of longshoremen of that port to walk barefooted on packages being loaded as a ship's cargo, should a longshoreman who, following the practice, cuts his foot upon the contents of the crushed package recover against the manufacturer who was truly ignorant but might have learned, by inquiry, of the practice?

The imposition upon manufacturers of such a burden, in terms of the time and resources which would be demanded, would, we agree, be "intolerable." The majority will not impose it. We do not believe that, as a consequence of our decision, manufacturers will remain deliberately ignorant of the practices of handlers with injuries to the handlers as a result. The almost total dearth of cases involving similar situations is an indication that longshoremen and other handlers have not been exposed to countless dangers caused by methods of packaging which fail to take into account the handlers' unusual working prac-

■ Since it is not possible to determine which of the two principles contained within the questioned instruction was applied by the jury, and since one of the included principles was erroneous, the judgment against Simpson cannot stand. See Davis v. Patrick, 122 U.S. 138, 154, 7 S.Ct. 1102, 30 L.Ed. 1090 (1887).

■ There must also be a reversal as to the judgments affecting the conflicting claims for indemnification. The liability of Grace Lines to Parks was fixed by the jury upon the determination under the instructions that its vessel was unseaworthy. The reaching of the verdict in such respect, both as to liability and as to the amount of damages, may have been influenced in some degree by considerations which were applied in the light of the erroneous instruction pertaining to the liability of Simpson. The district judge granted the shipowner indemnification from Simpson for the full amount of the judgment and denied Simpson's claim of indemnity against the shipowner and the stevedoring company. It is apparent from the district judge's memorandum of decision in connection with these claims that his conclusions were derived in part from acceptance of the jury's factual determinations in all respects. In the light of this record, the interests of justice require that all judgments which were entered in the District Court be reversed and that there be a retrial of the case in all its aspects and in the light of the views which are expressed herein.

Reversed and remanded.

BROWNING, Circuit Judge, with whom Judges HAMLEY, MERRILL, and DUNIWAY concur (dissenting):

The majority holds that a manufacturer is required to guard against only those risks which it actually knows. The more limited the manufacturer's knowledge, the less onerous its duty. Ignorance, no matter how unjustified, affords a complete defense to a charge of negligence in the ordinary case.[1]

This, in the majority's view, is the only alternative to a holding that all manufacturers, in whatever circumstances, are charged with knowledge of every loading practice, however "pe-

---

tices. The manufacturers' own self-interest in the product's arrival at its destination in an undamaged condition serves as some safeguard against injuries caused by practices of handlers which are unknown to the manufacturer. It is only in a rare case, such as the one at bar, that a longshoreman might be injured while practicing a custom unknown to the manufacturer. Even in this case, the question is not necessarily whether recovery can be had, but from whom. And the benefit that would accrue to the injured few cannot off-set the burden which the challenged principle would impose upon the many.

In general the rationale for recent extensions in the liability of manufacturers has been that "more and more complicated products with potentiality for harm if not properly used are being sold to relatively inexperienced laymen." 1 Frumer & Friedman, Products Liability § 8.01, p. 145 (1960). This rationale is inapplicable to our case. We agree that a handler should recover for an injury for which an ultimate intended user could recover if it would be reasonable for him to use the product in a same or similar manner. This principle was applied in Land O'Lakes Creameries, Inc. v. Hungerholt, 319 F.2d 352 (8th Cir. 1963). That case involved a product containing an imminently dangerous substance. A person delivering the product was allowed to recover for injuries sustained as a result of some of the substance leaking out of the container and into his shoe. We would also advocate recovery for injury sustained while doing an act which is both foreseeable and necessary in the putting of the product to its ultimate intended use. See Central Steel Tube Co. v. Herzog, 203 F.2d 544 (8th Cir. 1953), where the lever of a grain swather was tied for packing in such a manner as to create great tension, creating a hidden danger to whoever unpacked the machine.

1. The majority opinion suggests two possible exceptions. A duty may arise "if a hazard is so obvious as to permit of no doubt that one could have anticipated it"; and a different rule, not articulated, may apply if "the product is inherently dangerous or harmful."

culiar" "unique", or "even strange," occurring in "any port which the purchaser, a shipper, or transporter might select for loading and embarkation." [2]

## I

The case was tried and submitted to the jury upon a more sensible middle ground.

The jury was *not* instructed that Simpson "was obliged to learn" of the longshoremen's practice, no matter how unreasonable that obligation might be; the jury was *not* instructed that Simpson must "insure that [its] product be packaged in anticipation of whatever use to which it may be subjected by stevedores loading it as a part of a ship's cargo."

Quite the contrary, the trial court instructed the jury that the question was whether "the corporation *of ordinary prudence* [would] have exercised any greater care (that Simpson exercised) under *the same and existing circumstances*".[3] Simpson "was under a duty to exercise *reasonable care* to employ such materials and methods in the construction and the packaging of the doors or warning of danger, if any there was, as were appropriate to the use for which it was intended and would render the packaged doors *reasonably safe* for handling in the course of shipment as Simpson Timber Company *might reasonably be charged with* in anticipation of the fact that the goods would flow

in commerce." Simpson was required to exercise reasonable care to avoid injury to longshoremen walking on the cargo if, but only if, the jury found that Simpson "knew, or *in the exercise of reasonable care* should have known that workmen might walk on said packaged doors."

There was substantial evidence to support a jury finding that Simpson would have learned of the risk if it had acted with reasonable prudence.

Simpson assumed responsibility for packaging the doors properly for ocean carriage. It contracted to deliver the doors "suitably packaged for export shipment." It agreed to deliver them "FOB dock" in Portland, Simpson's home city, not at a distant port. The workmen at the Portland docks regarded walking on cargo as a necessary practice. The hold of a ship is of great depth, cargo must be loaded in layers, and longshoremen must walk on each layer of cargo stowed in place as they load the next. The practice was not unusual or peculiar, but was pervasive and long continued.

If Simpson did not know of the practice, it was aware of circumstances which should have suggested inquiry to a person of reasonable prudence. Simpson's manager had seen workmen walk on packaged doors while loading trucks at Simpson's plant. He "had been on the docks and seen the holds of ships, and * * * had 'wondered' how cargo was moved to portions of the hold away

2. We join the majority in passing over appellants' contentions (1) that the verdict was excessive, and (2) that a mistrial should have been declared because of an improper comment in the opening statement of plaintiff's counsel.

In a footnote reference to the first issue, the majority notes that plaintiff was not hospitalized, that his medical expenses were minimal, and that damages of $80,000 were awarded. The record also shows, however, that plaintiff's basic injury (a tear in a bicep muscle of his right arm, resulting in permanent loss of 80 per cent of the ability to turn the hand and one third of the lifting power of the arm), was not repairable, and that hospitalization and treatment would there-

fore have been futile. The record also shows that plaintiff's loss of income before trial was $5,000, and that his projected loss of future earnings totaled $65,000.

In a footnote reference to the second issue, the majority quotes a remark of the trial judge which might be read as suggesting doubt as to the correctness of his action in denying a mistrial. The record shows, however, that it was the trial judge's considered opinion, based on his personal observation of all the circumstances, that counsel's unfortunate comment was "pretty innocuous."

3. The emphasis is added, here and hereafter, unless otherwise indicated.

from the hatches." [4] Simpson knew that packaging cargo for export involved specialized problems, and that information regarding these problems was readily available. An expert in packaging cargo for export, whose offices were located on the Portland docks, testified that he had been consulted occasionally by Simpson.

Other door manufacturers exporting through Portland knew of the longshoremen's practice and the risk it involved. The Portland export-packaging expert testified that he had been consulted by twenty-five to thirty such manufacturers, and that it was their custom and practice to package doors for export so that they would be safe to walk on during loading.

The slightest effort on Simpson's part would have disclosed both the risk and the simple precautions necessary to avoid harm [5]—but Simpson's manager testified simply that he did not know how cargo was stowed aboard ship and made no effort to find out.[6]

## II

Reason and authority support the trial court's conclusion that it was Simpson's duty to exercise reasonable care to avoid harm to longshoremen walking on cargo if (but only if) Simpson knew of the risk, or a person in Simpson's circumstances, exercising reasonable care, would have known of it.

"The very concept of negligence presupposes that the actor either does foresee an unreasonable risk of injury, *or could foresee it if he conducted himself as a reasonably prudent man.*" 2 Harper & James, The Law of Torts § 16.5, p. 907 (1956). The authors quote Green v. Atlanta & Charlotte Air Line Ry., 131 S.C. 124, 126 S.E. 441, 444, 38 A.L.R. 1448 (1925), "The foundation of liability for negligence 'is knowledge— or what is deemed in law to be the same thing, opportunity, by the exercise of reasonable diligence to acquire knowledge.' "

A manufacturer's [7] duty to exercise care extends to "risks which are created in the course of uses of the chattel which the manufacturer *should reasonably anticipate.*" Restatement (Second), Torts, § 395, comment j. A manufacturer must foresee and guard against a given risk if it is one *"which a reasonable manufacturer would anticipate as likely enough to be taken into account"*; and it is ordinarily "a question for the jury whether the maker should have anticipated it." Harper & James, supra § 28.6,

4. Simpson's manager testified that Simpson had a warehouse in the Portland waterfront area which he visited each week or ten days; that Simpson shipped 16,000 to 18,000 doors overseas from Portland annually; and that Simpson was engaged in substantial importing operations.

5. The export-packaging expert testified that it was the custom and practice on the Portland waterfront to package cargo with material strong enough to support a man, or to use open crates, or to cut holes in the packaging so that surfaces which would not be walked on were visible, or to place warning notices upon packages which appeared to be solid but in fact were not.

6. Note 6 of the majority opinion suggests that the evidence may have been inadequate because it did not establish that it was the practice for longshoremen to carry a weight, or for more than one longshoreman to stand on a given package at the same time. The contention has no relevance to this case. The cardboard covering employed by Simpson is in evidence, and it is obvious from an examination of this exhibit that the thin cardboard which Simpson used was incapable of supporting a fraction of the weight of one, unburdened, man.

7. A package is as much a product as its contents, and the manufacturer is subject to the same rules of liability as to both. Prosser, 50 Minn.L.Rev. 791, 805–06 (1966); 1 Frumer & Friedman, Products Liability § 5.03 [1], p. 28 n. 22 (1966). See, for example, Land O'Lakes Creameries, Inc. v. Hungerholt, 319 F.2d 352, 360–361 (8th Cir. 1963); Butler v. L. Sonneborn Sons, Inc., 296 F.2d 623 (2d Cir. 1961); Central Steel Tube Co. v. Herzog, 203 F.2d 544, 546 (8th Cir. 1953); Restatement (Second), Torts § 395, comment (f) (5). Compare Great A & P. Tea Co. v. Miller, 316 F.2d 471 (5th Cir. 1963).

p. 1546. See also 1 Frumer & Friedman, supra §§ 8.03, 8.05; Noel, supra, 71 Yale L.J. at 856–85 (1962).

The decision of the Court of Appeals for the Second Circuit in Mazzi v. Greenlee Tool Co., 320 F.2d 821 (1963), illustrates the application of these principles. The defendant Greenlee Tool Company manufactured a pipe-bending press having a "shoe" as a component part. K. R. Wilson Company manufactured a similar machine. The Wilson press exerted a pressure of sixty tons psi against the "shoe", whereas defendant Greenlee's press was constructed to withstand a pressure of only forty tons psi. Plaintiff (not in privity with Greenlee) was injured when a Greenlee "shoe" which had been attached to a Wilson press broke when pressure was applied in excess of forty tons psi. The trial court directed a verdict in Greenlee's favor on two grounds, one of which was that the Greenlee "shoe" was designed and intended for use only on a Greenlee press. The Court of Appeals reversed.

The Court of Appeals held that it was error to direct a verdict "if the evidence was such that a jury could reasonably find that use [of a Greenlee "shoe"] on a Wilson press was intended by the manufacturer *or was reasonably foreseeable* and that failure to warn against the danger of such usage constituted negligence in the circumstances." 320 F.2d at 823.

Greenlee officials testified that Greenlee "shoes" were "not sold as single items to be used in any machine other than a Greenlee press." But plaintiff offered evidence "that it was the custom in the trade to buy the shoes independently of the machines," "that it was common practice to 'adapt one shoe from one press to another press'," and "that at the time of the accident Greenlee shoes were customarily sold [by retailers] as separate units and when sold no inquiry was made by the retailer as to their prospective use." 320 F.2d at 824–825. The Court of Appeals held that plaintiff's evidence "was sufficient to support a jury resolution that the use of the shoe on a Wilson rather than a Greenlee press * * * was intended or that defendant *should have reasonably foreseen* that its shoe would be so used and that failure to warn of the danger involved in such usage constituted negligence." 320 F.2d at 825.

The holding of the majority that liability is limited to injuries caused by risks which the manufacturer actually knew is irreconcilable with the decision in *Mazzi*. It is also contrary to the other well considered cases which recognize that the doctrine restricting liability to injuries resulting from the "intended use" of a manufacturer's products "is but a convenient adaptation of the basic test of 'reasonable foreseeability' framed to more specifically fit the factual situations out of which arise questions of a manufacturer's liability for negligence." Spruill v. Boyle-Midway, Inc., 308 F.2d 79, 83 (4th Cir. 1962). See Land O'Lakes Creameries, Inc. v. Hungerhold, supra, 319 F.2d 352, 361 (8th Cir. 1963); Butler v. L. Sonneborn Sons, Inc., supra, 296 F.2d 623, 625–626 (2d Cir. 1961). See also 1 Frumer & Friedman, supra, Products Liability §§ 8.03, 8.05, 15 (1964).

These and similar cases cannot be disposed of by attaching the label "inherently" or "imminently" dangerous to the products involved. These are simply adjectives applied *after* it has been decided that liability will be imposed; they are of no help in reaching that decision.[8] The "shoe" in *Mazzi*, the furniture polish in *Spruill*, the fertilizer in

---

8. "Although some decisions continue to speak the language of 'inherent danger', it has very largely been superseded by a recognition that what is involved is merely the ordinary duty of reasonable care imposed upon the manufacturer, as to any product which he can reasonably expect to be dangerous if he is negligent in its manufacture or sale." Restatement (Second), Torts § 395 comment a. See also 2 Harper & James, The Law of Torts, § 28.9 at 1552–55, § 28.11 at 1559 (1956); 1 Frumer & Friedman, Products Liability § 5.03 [1] (1966); Noel, 71 Yale L.J. 816, 818 (1962).

*Land O'Lakes*, the barrel in *Butler*, were not dangerous instrumentalities *per se*. Few things are dangerous in all circumstances; most things are dangerous in some.[9] Simpson's bundle of doors was innocuous for most purposes, but when "used as a floor, or walking surface, the bundle of doors was a trap." As the trial court instructed the jury, the question is simply whether a person of reasonable prudence, in Simpson's position, would have foreseen that risk.

The majority cites no authority supporting the "recognized tort rules" which require a manufacturer to exercise reasonable care to eliminate known hazards but not hazards which a reasonably prudent manufacturer would have foreseen. McCready v. United Iron & Steel Co., 272 F.2d 700 (10th Cir. 1959), and Cohagan v. Laclede Steel Co., 317 S.W.2d 452 (Mo.1958), announce no such principle. In each case, the appellate court agreed with the trial court that the evidence was insufficient to charge the defendant with knowledge of the risk, but in neither did the court hold that evidence of actual knowledge was required. As the majority's quotation from *McCready* indicates, the Court of Appeals for the Tenth Circuit recognized that a duty to exercise proper caution would arise if the risk were one "reasonably anticipated,"[10] and the Court of Appeals for the Tenth Circuit held only that "there was no showing that [the defendant manufacturer] had knowledge of the practice of workmen in using the crossbars in casements for handholds or footrests, *or that the prac-*

*tice was so general that it was charged with knowledge thereof."* 272 F.2d at 703.[11] Similarly, the court in *Cohagan* found a failure of proof because there was no *"substantial evidence of a custom or usage* imposing a duty on [the defendant manufacturer] to recognize the attempted use as a proper or intended use" (317 S.W.2d at 454); and the Supreme Court of Missouri held only that evidence that the use resulting in injury occurred *"on isolated occasions* does not tend to establish a duty on the part of the manufacturer \* \* \*"" (317 S.W.2d at 457). Thus the rationale of these cases is not inconsistent with the trial court's instructions in the present case, but supports those instructions.[12]

The majority suggests that the "almost total dearth of cases involving similar situations" indicates that manufacturers have not in fact ignored the dangers to which handlers of their products may be exposed. Before the majority spoke, a well advised manufacturer would not have assumed that he could safely rely upon ignorance of risks which a reasonably prudent person would have discovered. Moreover, a latent defect in cargo packaging renders the vessel unseaworthy (Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 212–213, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 364, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962); United States Lines Co. v. King, 363 F.2d 658, 661 (4th Cir. 1966); Reddick v. McAllister Lighterage Line, Inc., 258 F.2d 297, 299 (2d Cir. 1958)), and injured

---

9. "Duty of care has been found in the manufacture or sale of coffee urns, cigarettes, hair combs, sewing machines, a bottle of perfume, a sanitary napkin, a ladder, a chain, a pulley, gasoline and electric stoves, and a sofa bed. It is certainly the prevailing view that it extends to any product whatever which, if in fact negligently made, may reasonably be expected to be capable of inflicting injury." Prosser, Law of Torts § 84 at 500–01 (2d ed. 1955), § 96 at 662 (3d ed. 1964).

10. Compare the majority's suggestion that *McCready* holds that the manufacturer

must "intend or anticipate" the use for a duty to arise.

11. Compare the majority's statement that *McCready* held that "the manufacturer was not under a legal duty to investigate all customs, *however universal* \* \* \*."

12. The majority's holding is also contrary in principle to Weekes v. Michigan Chrome & Chem. Co., 352 F.2d 603, 611 (6th Cir. 1965), in which the court granted a new trial in part because of an instruction which limited contributory negligence in a products liability case to risks actually known to the plaintiff.

longshoremen would ordinarily sue the ship, rather than the packager, to avoid the burden of proving negligence. 54 Geo.L.J. 1939 n. 2 (1966).

This suggests another unfortunate consequence of the rule adopted by the majority. It is generally thought desirable to impose the burden of loss upon the person best able to remove the risk. Italia Societa, etc. v. Oregon Stevedoring Co., 376 U.S. 315, 323–324, n. 10, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964). But under the majority decision, liability falls upon the ship without regard to fault, and, in this case, in the face of a finding by the trial court (made after a separate trial of the issue of indemnity) that the shipowner neither knew nor in the exercise of reasonable care could have known of the dangerous condition of the package. Simpson, on the other hand, is freed from liability, though only Simpson knew of the latent defect and might have taken steps to eliminate it. No one else could have discovered the danger without dismantling or destroying the package—in the face of a warning, printed on the cardboard cover by Simpson, that the cover was not to be removed until the doors were unpacked for installation.

Even if the majority is right in faulting the instruction as to Simpson's negligence, this affords no justification whatever for setting aside the verdict in plaintiff's favor against Grace Lines. Grace Lines does not seek review of the determination that it was liable to plaintiff; its appeal is limited solely to the alleged excessiveness of the verdict. Under the trial court's instructions, the verdict against Grace Lines was based entirely upon the jury's determination that the vessel was unseaworthy. Although the majority suggests it "may have been influenced in some degree by considerations which were applied in the light of the erroneous instruction pertaining to the liability of Simpson," the majority does not indicate what these "considerations" may have been. It would be impossible to do so. Simpson's negligence had no relevance whatever to the liability of Grace Lines, and the instructions made this entirely clear.

The case was properly submitted to the jury,[13] and the judgment should be affirmed.

---

13. Speaking only for himself, and not for the other Judges joining in this dissent, the writer would note that the trial court's instructions might well have gone farther than they did.

When Simpson undertook to package doors for export it was required to anticipate not only those risks which were reasonably foreseeable to Simpson, in Simpson's particular circumstances, but also such risks as were foreseeable to those who were engaged at the time and place in question in the business which Simpson chose to enter. "In the field of manufacturers' liability questions of foreseeability are closely entwined with the status of the defendant; as a manufacturer he is held to the knowledge and skill of an expert in his field." Noel, supra, 71 Yale L.J. at 847–48 (1962). "[M]en who engage in certain activities or come into certain relationships with people or things are under peculiar obligation to acquire knowledge and experience about that activity, person or thing. * * * Thus * * * the man-

ufacturer must learn of dangers that lurk in his processes and his products." 2 Harper & James, supra § 16.5 at 915.

See also Guffie v. Erie Strayer Co., 350 F.2d 378, 381 (3d Cir. 1965); Braun v. Roux Distrib. Co., 312 S.W.2d 758, 763 (Mo.1958); Prosser, Law of Torts § 31 at 131–132 (2d ed. 1955), § 32 at 163 (3d ed. 1964). Dean Prosser quotes Gobrecht v. Beckwith, 82 N.H. 415, 135 A. 20, 22, 52 A.L.R. 858 (1926), "Where a duty to use care is imposed and where knowledge is necessary to careful conduct, voluntary ignorance is equivalent to negligence."

To hold otherwise would encourage deliberate ignorance and reduce the incentive for newcomers to acquire information known to those in the industry which might prevent injury or death. As noted earlier, there was ample evidence that other persons then engaged in the business of packing doors for export across the Portland docks were well aware of the longshoremen's loading practices.